IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHAEL WADE NANCE,                )
     Petitioner,                )
                              )
vs.                                )          Case No. 1:13-CV-4279-WSD
                              )
WARDEN,                            )
Georgia Diagnostic Prison,         )
     Respondent.                )

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Brian S. Kammer (Ga. 406322)
Lauren Caudill (Ga. 857443)
Georgia Resource Center
303 Elizabeth Street, NE
Atlanta, GA 30307
404-222-9202
Fax: 404-222-9212
grc@garesource.org

ON BEHALF OF PETITIONER

## <u>TABLE OF CONTENTS</u>

PROCEDURAL HISTORY.................................................................................3

CLAIMS FOR RELIEF ..................................................................................6

**Claim One:** Petitioner Was Deprived Of His Right To The Effective Assistance Of Counsel At Trial And On Appeal, In Violation Of His Rights Under The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution, *Strickland v. Washington*, 466 U.S. 668 (1984), And Related Precedent.................................................6

**Claim Two:** Misconduct By The Prosecution Team And Other State Agents Deprived Petitioner Of His Constitutional Rights To Due Process And A Fair Trial, In Violation Of The Fifth, Sixth, Eighth And Fourteenth Amendments To The United States Constitution And Related Precedent. ................21

**Claim Three:** Misconduct On The Part Of The Jurors Violated Petitioner's Rights Under The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution And Related Precedent........................................26

**Claim Four:** The Trial Court's Improper Rulings And Other Errors Deprived Petitioner Of A Fair Trial And Reliable Sentencing, In Violation Of The Fourth, Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution And Related Precedent. ...........................28

**Claim Five:** Petitioner Was Denied Due Process Of Law By The Instructions Given To The Jury At Both Phases Of His Capital Trial, In Violation Of The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution And Related Precedent........................................34

**Claim Six:** The Death Penalty In Georgia Is Imposed Arbitrarily And Capriciously And Disproportionately And Amounts

i

To Cruel And Unusual Punishment, Violating Petitioner's Rights Under The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution And Related Precedent........................................ 46

**Claim Seven:** Petitioner Was Denied Due Process Of Law When Being Forced To Wear A Stun Belt During Both Phases Of His Trial, In Violation Of The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution And Related Precedent........................................ 53

**Claim Eight:** Each Phase Of Petitioner's Trial Was Fraught With Procedural And Substantive Errors Which, Viewed Cumulatively, Cannot Be Harmless Because The Combination Of Errors Deprived Him Of The Fundamentally Fair Trial Guaranteed By The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution And Related Precedent. ................ 53

**Claim Nine:** The Execution Of Petitioner By Lethal Injection Is Cruel And Unusual Punishment, In Violation Of His Rights Under The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution And Related Precedent. .................................................................. 60

PRAYER FOR RELIEF ....................................................................... 72

NOTICE OF ELECTRONIC FILING AND CERTIFICATE OF SERVICE........ 74

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHAEL WADE NANCE,          )
    Petitioner,          )
              )
vs.          )          Civil Case No. 1:13-CV-4279-WSD
              )
WARDEN,          )
Georgia Diagnostic Prison,          )
    Respondent.          )

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Comes now the Petitioner, MICHAEL WADE NANCE, by and through undersigned counsel, and invokes this Court's jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 2254.

1.     This petition follows the form established by the Model Form for Use in Applications for Habeas Corpus under 28 U.S.C. § 2254, prescribed by the Rules Governing § 2254 Cases in United States District Courts.  It pleads Petitioner's claims for relief and alleges the constitutional errors raised.  In conformity with the form and practice, the petition does not make detailed legal argument, address procedural issues or affirmative defenses that the Respondent may choose to raise, or analyze in any detail the state court decisions under the provisions of 28 U.S.C. § 2254(d) and (e).  Petitioner shall respond in memoranda of law to any procedural issues the Respondent may raise as affirmative defenses

and shall submit briefing on the merits of the claims properly before the court which will include analysis under § 2254(d) and (e).

2. This petition states claims that have been raised in state courts in exhaustion of state remedies. It is being filed on this date in order to comply with the limitations period of the Anti-Terrorism and Effective Death Penalty Act. However, the investigation and research of Petitioner's case continues, and he may seek permission of the Court to amend, correct or modify the claims based upon the result of this continued investigation and research.

3. Petitioner is indigent and was so found by the Georgia state courts during trial, direct appeal and state post-conviction proceedings. This Court granted Mr. Nance's Motion to Proceed *In Forma Pauperis* on February 7, 2014.

4. Petitioner seeks relief in the form of an order granting the writ of habeas corpus as to his conviction and death sentence, and granting all other relief which the Court may deem just, proper and equitable. Petitioner submits that the state court convictions, death sentence, and affirmances on direct appeal and in state habeas corpus proceedings resulted from violations of Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Petitioner contends that the state courts' findings are contrary to and/or an unreasonable application of clearly established federal law as determined

2

by the United States Supreme Court; involved an unreasonable determination of the facts in light of the evidence; and/or involved the unreasonable and arbitrary denial of relief. *See* 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362 (2000).

## PROCEDURAL HISTORY

5. Petitioner is a person in the custody of the State of Georgia. The name and location of the court which entered the judgment of conviction and sentence under attack are: Superior Court of Gwinnett County.

6. The date of the judgment of conviction was September 25, 1997. Petitioner was convicted of malice murder, felony murder, criminal intent to commit armed robbery, theft by taking, aggravated assault, and possession of a firearm during the commission of a felony.

7. The date of the judgment of sentence was September 26, 1997. Petitioner was sentenced to death on the charge of malice murder. In addition to the death sentence, Petitioner was sentenced to concurrent terms of twenty years for theft by taking and ten years for criminal attempt the commit armed robbery, and consecutive term of five years for possession of a firearm during the commission of a felony. The felony murder conviction was vacated by operation of law.

8. At his trial, Petitioner pleaded not guilty.

3

9.      Prior to his trial, Petitioner brought an interlocutory appeal before the Supreme Court of Georgia regarding issues of double jeopardy.  The appeal was denied on June 3, 1996.  *Nance v. State*, 266 Ga. 816 (1996).  A timely filed motion for reconsideration was denied on June 25, 1996.

10.     The trial on the issue of guilt or innocence and on the issue of sentencing was determined by a jury.

11.     Petitioner appealed his conviction and sentence of death. The Supreme Court of Georgia affirmed Petitioner's conviction but reversed the sentence of death on February 28, 2000.  *Nance v. State*, 272 Ga. 217 (2000).  A timely filed motion for reconsideration was denied on March 23, 2000.

12.     Petitioner filed a petition for certiorari review in the Supreme Court of the United States, which was denied on October 16, 2000.  *Nance v. Georgia*, 531 U.S. 950 (2000).

13.     Prior to his resentencing trial, Petitioner brought an interlocutory appeal before the Supreme Court of Georgia regarding issues of double jeopardy. The appeal was denied on October 1, 2001.  *Nance v. State*, 274 Ga. 311 (2001).

14.     At his resentencing trial, the trial on the issue of sentencing was determined by a jury.  On September 20, 2002, the jury recommended a sentence of death, which the court imposed.

4

15.     Petitioner appealed his sentence of death. The Supreme Court of Georgia affirmed Petitioner's sentence of death on December 1, 2005. *Nance v. State*, 280 Ga. 125 (2005).  A timely filed motion for reconsideration was denied on January 17, 2006.

16.     Petitioner filed a petition for certiorari review in the Supreme Court of the United States, which was denied on October 2, 2006. *Nance v. Georgia*, 549 U.S. 868 (2006).  A timely filed petition for rehearing was denied on November 27, 2006. *Nance v. Georgia*, 549 U.S. 1073 (2006).

17.     On March 8, 2007, Petitioner filed a Petition for Writ of Habeas Corpus in the Superior Court of Butts County, Georgia, and amended that petition on January 17, 2008.  Petitioner was granted leave to proceed *in forma pauperis*.

18.     After an evidentiary hearing and submission of post-hearing briefs, the state habeas court granted the writ as to Petitioner's sentence on September 6, 2012.  On June 17, 2013, the Supreme Court of Georgia reversed the state habeas court and reinstated Petitioner's death sentence.  *Humphrey v. Nance*, 293 Ga. 189 (2013).  Petitioner filed a petition for certiorari review in the Supreme Court of the United States, which was denied on January 27, 2014.  *Nance v. Chatman*, 134 S. Ct. 1026 (2014).  This Petition follows.

5

## CLAIMS FOR RELIEF

19.    Each claim for relief raised below is predicated on the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and on other law set forth in the Petition.

**Claim One:**   **Petitioner Was Deprived Of His Right To The Effective Assistance Of Counsel At Trial And On Appeal, In Violation Of His Rights Under The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution, *Strickland v. Washington*, 466 U.S. 668 (1984), And Related Precedent.**

20.    All other claims and allegations in this Petition are incorporated herein by this reference.

21.    Petitioner was denied his right to the effective assistance of counsel at his capital trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  *See Strickland v. Washington*, 466 U.S. 688 (1984); *see also Sears v. Upton*, 130 S. Ct. 3259 (2010); *Porter v. McCollum*, 558 U.S. 30 (2009); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000).   Counsel's ineffectiveness at trial includes, but is not limited to, the following:

a)    Counsel failed to conduct an adequate pretrial investigation into the State's case and defenses available to Petitioner, including but not limited to,

6

the psychological, medical and psychiatric factors affecting Petitioner's mental state during, before, and after the offense;

b)     Counsel failed to make adequate and timely requests for continuances in order to prepare for trial and failed to make use of time available to adequately investigate and prepare for trial;

c)     Counsel failed to make timely requests for the assistance of investigative support, particularly the assistance of a crime-scene reconstructionist, a ballistics expert, an expert on environmental medicine, and a forensic pathologist, so that counsel could have conducted a thorough and adequate pretrial investigation into available defenses at both phases of trial;

d)     Counsel failed to adequately use the investigatory tools and services to which counsel had access, including a crime-scene reconstructionist, a ballistics expert, an expert on environmental medicine, and a forensic pathologist;

e)     Counsel failed to adequately employ and utilize an independent mental health expert to which Petitioner was entitled under *Ake v. Oklahoma*, 470 U.S. 68 (1985);

f)     Counsel failed to adequately litigate the trial court's erroneous admission of testimony of a State mental-health expert as proscribed by *Estelle v. Smith*, 451 U.S. 454 (1981);

7

g)    Counsel failed to conduct an adequate pretrial investigation into Petitioner's life, background, and mental health status to present to the jury evidence in mitigation of punishment;

h)    Counsel failed to present a complete picture of Petitioner's background, including his mental health problems and history of being abused emotionally and physically;

i)    Counsel failed to investigate and present evidence of the history of alcohol and substance abuse in Petitioner's family;

j)    Counsel failed to locate, interview, and present as witnesses numerous lay and expert witnesses who could have offered compelling mitigating evidence regarding Petitioner;

k)    Counsel failed to timely file several pretrial motions necessary to protect Petitioner's right to a fair trial;

l)    Counsel failed to retain and present testimony of a mental health expert or experts who could explain Petitioner's brain damage, cognitive impairments, and the causes and effects of his chronic drug dependency;

m)    Counsel failed to adequately object and litigate that the prosecution should be precluded from introducing evidence of similar transactions and other prior bad acts;

8

n)     Counsel failed to conduct an adequate pretrial investigation into the voluntariness of Petitioner's statements to law enforcement personnel, and specifically failed to investigate the effect of Petitioner's mental capacity, his medical and psychological history, and his intoxication on his mental state at the time he provided the incriminating statements;

o)     Counsel failed to present adequately information and evidence in pretrial motions and proceedings and at trial relating to Petitioner's allegedly voluntary waiver of constitutional rights during interrogation by law enforcement;

p)     Counsel failed to obtain and review all records, files, and evidence in the possession of the State to which Petitioner was entitled access;

q)     Counsel failed to present expert testimony on the impact of the dye packs on Petitioner;

r)     Counsel failed to prepare for and conduct an adequate examination of potential jurors with regard to their understanding of the presumption of innocence, potential bias regarding the death penalty, and other issues during voir dire in order to ensure Petitioner's right to a fair trial and reliable sentencing; failed adequately to challenge the trial court's improper excusal of certain jurors for hardship reasons; failed adequately to challenge the trial court's improper voir dire of potential jurors; failed to challenge the trial court's refusal to

excuse certain jurors for cause; failed adequately to challenge the district attorney's improper voir dire; and generally failed adequately to protect Petitioner's right to a jury pool and jury which adequately represented the community and which could afford Petitioner the fair trial and reliable sentencing to which he was entitled under the Constitutions of the United States and Georgia;

s)      Counsel failed to make an informed and knowledgeable decision to waive the confidentiality of the opinions and findings of Petitioner's mental-health expert;

t)      Counsel failed to support the chosen defense by securing and adequately utilizing the services of necessary experts, including but not limited to, mental-health experts, a crime-scene reconstructionist, a ballistics expert, an expert on environmental medicine, and a forensic pathologist, with which counsel could have effectively challenged the State's case against Petitioner at either phase of trial;

u)      Counsel failed to elicit testimony from several available lay and expert witnesses that would have supported the chosen defense;

v)      Counsel failed to object to the admission of several items of evidence and testimony offered by the State during the guilt/innocence and sentencing phases of trial and permitted the jury to receive and consider evidence

10

that was improper, inadmissible, prejudicial, irrelevant, and/or false, including but not limited to, the highly prejudicial video from the crime scene and testimony regarding the victim;

w)    Counsel failed to have experts explain the role of Petitioner's brain damage and intoxication in his statements to law enforcement;

x)    Counsel inadequately instructed their investigators on obtaining mitigating evidence;

y)    Counsel improperly aligned itself with the prosecution during the penalty phase;

z)    Counsel failed to raise proper and timely objections to improper charges given by the trial court to the jury at the conclusion of the guilt and sentencing trials;

aa)    Counsel failed to prepare and adequately examine the defense witnesses called during the sentencing trial, including, but not limited to, Petitioner's family members and a mental-health expert;

bb)    Counsel failed to present material evidence that was reasonably available to counsel during Petitioner's guilt/innocence and sentencing trials, particularly evidence pertaining to the accidental discharge of the weapon, the

effects of toxic chemicals on Petitioner, Petitioner's brain damage and cognitive impairments, and the effects of his history of drug use;

      cc)    Counsel failed to adequately cross-examine the State's witnesses, including, but not limited to, the failure to impeach, the failure to explore questions of bias and motive on the part of the witnesses, the failure to correct or prevent false testimony, and, in several instances, the failure to conduct any cross-examination;

      dd)    Counsel failed to present its case and arguments to the jury in a logical, effective manner;

      ee)    Counsel failed to understand the role of mitigation, the need for mitigation, what constitutes mitigation, and how to effectively present a case for mitigation at the penalty phase;

      ff)    Counsel failed to adequately challenge the petit jury;

      gg)    Counsel failed to adequately challenge the prosecution's late and prejudicial notice of aggravation witnesses;

      hh)    Counsel failed to investigate key portions of Petitioner's life and background for mitigating evidence, including, but not limited to, the family history of Petitioner's biological parents and his early drug use;

ii)     Counsel failed to adequately object to and litigate the trial court's inappropriate and inapplicable jury instructions in the guilt/innocence and sentencing trials;

jj)     Counsel failed to request and litigate appropriate and applicable jury instructions at the guilt/innocence and sentencing trials;

kk)     Counsel failed to adequately litigate the trial court's decision not to instruct the jury on accident and voluntary manslaughter;

ll)     Counsel failed to object to those portions of the trial court's charge which failed to adequately define mitigating circumstances and misled the jury in other ways;

mm)   Counsel failed to present significant evidence that Petitioner suffered from significant psychological disorders, including brain damage, cognitive impairments, and drug addiction prior to, during, and subsequent to the offense;

nn)     Counsel failed to adequately litigate the State's decision to require Petitioner to wear a stun belt through during both phases of his trial;

oo)     Counsel failed to present and utilize critical, available evidence regarding the physiological and psychological effects of the dye packs;

13

pp)   Counsel failed to make informed and competent opening statements and closing arguments in the guilt/innocence and sentencing trials;

qq)   Counsel failed to adequately prepare Petitioner's witnesses, failed to elicit relevant, mitigating evidence that the witnesses possessed, and failed to limit the scope of their testimony to relevant, mitigating evidence;

rr)   Counsel failed to represent Petitioner with full loyalty and to represent Petitioner in his best interests;

ss)   Counsel failed to direct their investigators, failed to develop a strategy for the penalty-phase presentation, failed to adequately prepare witnesses, and failed to follow up on preliminary investigation;

tt)   Counsel failed to explain to the jury the contents and significance of exhibits entered into evidence;

uu)   Counsel failed to subpoena documents and witnesses in a timely and adequate manner;

vv)   Counsel failed adequately to challenge the prosecution for striking prospective jurors on the basis of race and/or gender;

ww)   Counsel failed to elicit favorable, mitigating testimony from the State's witnesses;

14

xx)   Counsel failed to adequately litigate and present evidence of the effects of the dye packs on Petitioner;

yy)   Counsel failed to adequately protect Petitioner's constitutional rights during all stages of Petitioner's trial, including but not limited to, Petitioner's rights under the Confrontation Clause;

zz)   Counsel failed to object to the prosecution's attempts to limit the scope of mitigation, confuse the jury as to what constitutes mitigation, and question Petitioner's mental-health witness regarding irrelevant, inapplicable jury verdicts;

aaa)   Counsel failed adequately to object to and litigate improper testimony, including, but not limited to, testimony that was hearsay, irrelevant, cumulative, outside the personal knowledge of the witness, and testimony that was highly prejudicial;

bbb)   Counsel failed to object to improper and prejudicial statements made by the State during opening and closing arguments of both the guilt/innocence and sentencing phases of the trial;

ccc)   Counsel failed to request that the court inquire into possible juror misconduct by questioning jurors or by permitting counsel to question jurors;

ddd)   Counsel failed to object to defects in the charging documents;

15

eee)   Counsel failed to provide Petitioner with conflict-free assistance by investigators and experts and failed to protect Petitioner's individual interests with full loyalty and zeal;

fff)   Counsel failed to advise their investigator, failed to communicate effectively with the investigator, and failed to utilize information the investigator obtained;

ggg)   Counsel failed to adequately investigate and present evidence regarding the lethal injection protocols in Georgia and their constitutionality;

hhh)   Counsel failed to ensure that sensitive bench conferences were kept outside of the hearing of the jury;

iii)   Counsel failed to emphasize to the jury that it could consider that evidence presented during the guilt/innocence phase as mitigation evidence during the penalty phase;

jjj)   Counsel failed to call as witnesses available mental health and medical professionals who had evaluated and treated Petitioner;

kkk)   Counsel failed to adequately litigate the issue that Georgia's lethal injection protocols are unconstitutional;

lll)   Counsel failed to adequately litigate the admission of Petitioner's prior bank robberies;

16

mmm)    Counsel failed to ensure that all evidence in this case be preserved for use during Petitioner's habeas corpus proceedings;

nnn)  Counsel failed to adequately seek and obtain an offer to plead the case and failed to convince the prosecution to accept a guilty plea in exchange for a sentence less than death;

ooo)  Counsel failed to object to the trial court's admission of compelling prejudicial and incriminating testimony during the guilt/innocence trial;

ppp)  Counsel failed to ensure that their investigator could effectively communicate with witnesses;

qqq)  Counsel failed to adequately litigate the unconstitutionality of lethal injection, particularly in terms of Petitioner's long history of intravenous drug use;

rrr)   Counsel failed to object to improper and extraneous comments by the judge;

sss)   Counsel failed to object to burden-shifting;

ttt)   Counsel failed to introduce into evidence mitigating audiotapes of Petitioner's statements and failed to obtain accurate transcripts of such tapes;

17

uuu) Counsel failed to adequately and timely object to improper statements by the prosecution;

vvv) Counsel failed to object to the admission of the Petitioner's out-of-state court and prison records;

www) Counsel failed to adequately litigate Petitioner's claims under the Double Jeopardy Clause;

xxx) Counsel failed to ensure that the jury verdicts were on a proper, non-leading, and non-prejudicial verdict form;

yyy) Counsel failed to explain Petitioner's mental health in a thorough, complete, and corroborated manner;

zzz) Counsel failed to keep out of evidence an altered videotape that was prejudicial and misleading;

aaaa) Counsel failed to emphasize to the jury that Petitioner was already under a life-without-parole sentence from his federal convictions;

bbbb) Counsel failed to investigate and present evidence to rebut the aggravating evidence presented by the prosecution;

cccc) Counsel failed to present these issues during the Motion for New Trial and on appeals to the Supreme Court of Georgia.

18

22.   Counsel's inadequate preparation and investigation at all phases of trial were due to counsel's unreasonable actions and omissions, unreasonable schedule, and the withholding of evidence by the State.   But for counsel's ineffective representation, there is a reasonable probability that the result of each phase of trial would have been different.   Counsel's unreasonable actions and omissions at trial prejudiced the outcomes of both the guilt/innocence and sentencing phases of Petitioner's capital trial.   But for counsel's ineffective representation, there is a reasonable probability that the result of each phase of the trial would have been different.   *See Strickland v. Washington*, 466 U.S. 688 (1984); *see also Williams v. Taylor*, 529 U.S. 362 (2000).

23.   The appellate-level right to effective assistance of counsel incorporates the Sixth Amendment right to effective assistance of counsel.   *Evitts v. Lucey*. 469 U.S. 387 (1985).   Appellate counsel must function as "an active advocate on behalf of his client," *Anders v. California*, 386 U.S. 738 (1967), and must provide "expert professional assistance [which is] necessary in a legal system governed by complex rules and procedures . . . ." *Lucey*, 469 U.S. at 394 n.6.

24.   These are not merely arcane jurisprudential precepts.   "Lawyers in criminal cases are necessities, not luxuries."   *United States v. Cronic*, 466 U.S. 648, 653 (1984) (internal quotation marks omitted).   Counsel at the appellate level

19

is crucial to "meet the adversary presentation of the prosecutor." *Lucey*, 469 U.S. at 394 n.6. Thus, effective counsel does not leave an appellate court with "the cold record which it must review without the help of an advocate." *Anders*, 386 U.S. at 745. Counsel must "affirmatively promote his client's position before the court," *Mylar v. Alabama*, 671 F.2d 1299, 1301 (11th Cir. 1982), to "induce the court to pursue all the more vigorously its own review because of the ready references not only to the record but also to the legal authorities as furnished it by counsel." *Anders*, 368 U.S. at 745; *see also Matire v. Wainwright*, 811 F.2d 1430, 1438-39 (11th Cir. 1987); *Mylar*, 671 F.2d at 1301.

25.     Counsel rendered ineffective assistance during the direct appeal of Petitioner's conviction and the direct appeal of Petitioner's sentence when they unreasonably and prejudicially failed to raise meritorious issues on appeal and by extraordinary motion for new trial; counsel were similarly ineffective for failing to brief, argue, and litigate adequately meritorious issues that were raised. Such issues include, but are not limited to, failing to argue that Georgia's lethal injection protocols are unconstitutional, in part due to Petitioner's history of intravenous drug use; failing to preserve the claim that prosecutors made improper comments to jurors during voir dire; waiving the claim of error with regard to the admission of Petitioner's prison records; and failing to ensure that the Supreme Court of

Georgia conducted a reliable, accurate proportionality review of Petitioner's death sentence.  It is undisputed that motion for new trial and direct appeal are critical stages at which constitutionally effective counsel is required.  *See Lucey*, 469 U.S. at 396-97; *Anders*, 386 U.S. at 741-44; *Gideon v. Wainwright*, 372 U.S. 335, 342-45 (1963); *Douglas v. California*, 372 U.S. 353, 355-58 (1963); *United States v. Berger*, 375 F.3d 1223, 1226 (11th Cir. 2004); *Williams v. Turpin*, 87 F.3d 1204, 1209 (11th Cir. 1996).  But for counsel's ineffective representation, there is a reasonable probability that the result of Petitioner's direct appeal would have been different.

**Claim Two:**      **Misconduct By The Prosecution Team And Other State Agents Deprived Petitioner Of His Constitutional Rights To Due Process And A Fair Trial, In Violation Of The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution And Related Precedent.**

26.    All other claims and allegations in this Petition are incorporated herein by this reference.

27.    The State suppressed information favorable to the defense at both phases of the trial.  The materiality of the suppressed evidence undermines confidence in the outcome of the guilt/innocence and penalty phases of Petitioner's trial and Petitioner's direct appeal, in violation of *Brady v. Maryland*, 373 U.S. 83,

84-86 (1963), and *Kyles v. Whitley*, 514 U.S. 419, 432-38 (1995).[1]  The State took advantage of Petitioner's ignorance of the undisclosed favorable information by arguing to the jury that which it knew or should have known to be false and/or misleading.  *See United States v. Sanfilippo*, 564 F.2d 176, 179 (5th Cir. 1977).[2]

28.    The State failed to disclose benefits or promises extended to State witnesses in exchange for their testimony and allowed its witnesses to convey a false impression to the jury, and there is a reasonable likelihood that the false impressions could have affected the jury's deliberations.  *See Giglio v. United States*, 405 U.S. 150, 153-54 (1972).  The State also failed to objectively and impartially prosecute Petitioner, failed to objectively and impartially assess whether Petitioner should be permitted to enter into a plea agreement, and failed to objectively and impartially determine whether a death sentence should be sought against Petitioner, thereby depriving Petitioner of constitutional rights associated with a fair trial.

---

[1] The State has a continuing obligation to disclose favorable evidence, which extends through post-conviction proceedings, and the State may be continuing to withhold favorable evidence from Petitioner. *See Downs v. Sec'y, Fla. Dep't of Corr.*, 738 F.3d 240, 258-59 (11th Cir. 2013) (citing *Dist. Att'ys Office for 3d Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009)).

[2] The United States Court of Appeals for the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*).

29.    The State elicited false and/or misleading testimony from State witnesses at trial, in violation of *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The State's knowing presentation of false and/or misleading testimony violated Petitioner's rights under *Mooney v. Holohan*, 294 U.S. 103, 112-13 (1935). The State knowingly or negligently presented false testimony in pretrial and trial proceedings, and there is a reasonable likelihood that the false testimony could have affected the judgment of the trial court and/or the jury at both phases of the trial. *See United States v. Agurs*, 427 U.S. 97, 103 (1976). The misconduct of the State includes, but is not limited to, mischaracterizing mitigating evidence to the jury, exaggerating aggravating evidence, leading the jury to believe that it could not hear a recording of Petitioner's statements, and eliciting improper testimony from the State's mental health expert.  Regardless of whether the State knew or should have known that it was presenting false and/or misleading evidence, the mere presentation of such evidence and the jury's reliance upon such evidence at both phases of the trial deprived Petitioner of due process.[3]   *See Sanders v. Sullivan*, 863 F.2d 218 (2nd Cir. 1988).[4]

_____

[3] To the extent that the suppressed favorable evidence might have been available to Petitioner, but his counsel failed to obtain and effectively utilize the information, counsel was prejudicially ineffective.

[4] *But see Jacobs v. Singletary*, 952 F.2d 1282, 1287 n.3 (11th Cir. 1992).

23

30.    During voir dire, the prosecution improperly used its peremptory strikes to systematically exclude jurors on the basis of race and/or gender.  *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 130-31 (1994); *Batson v. Kentucky*, 476 U.S. 79, 84 (1986).[5]

31.    The State introduced and argued impermissible evidence, some of which was false and inaccurate, including improper victim-impact testimony, highly prejudicial photographs and a video of a crime scene, unsubstantiated arguments that Petitioner needed to be confined with shackles and/or a stun belt, and extensive information about the victim.  The State also improperly introduced into evidence a redacted and altered video of the scene of the standoff.  The prosecution attempted to remove from the jury's consideration Petitioner's history of mental illness and substance abuse.  The prosecution further infringed upon Petitioner's constitutional rights by improperly seeking a death sentence, refusing to accept a plea offer, allowing personal conflicts of interest to inform prosecution decisions, and improperly stating the law concerning mitigating circumstances while questioning the jury, thereby shifting the burden and confusing the jury.  Petitioner's rights to due process and a fair trial were violated by improper,

_____

[5] To the extent trial counsel failed to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby.

prejudicial, and misleading remarks by the prosecution in its argument at Petitioner's trial and in pretrial proceedings, in contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. *See Gregg v. Georgia*, 428 U.S. 153 (1976).[6]  Failure of the State to follow its rules of evidence denies the defendant his right to due process guaranteed by the Fourteenth Amendment. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Spencer v. Texas*, 385 U.S. 554, 560-61 (1967); *Rochin v. California,* 342 U.S. 165, 172-73 (1952).

32.   The jury bailiffs and/or sheriff's deputies and/or other State agents who interacted with jurors engaged in improper communications with jurors which deprived Petitioner of a fair trial and reliable sentencing.  *See, e.g.*, *Turner v. Louisiana*, 379 U.S. 466, 472-74 (1965).[7]  Such State agents also improperly communicated with Petitioner, questioning him after he had invoked his

---

[6] To the extent that Petitioner's counsel failed to object to these improper comments and seek a mistrial or other appropriate relief, or to otherwise preserve objections to the State's argument and effectively present claims based on that argument in Petitioner's direct appeal, counsel was ineffective, and Petitioner was prejudiced thereby.  To the extent that the trial court attempted to cure the improper comments by instructing the jury, the court's instructions failed to cure the error and actually exacerbated it by drawing the jury's attention to the improper comments.  The trial court improperly failed to correct these errors on its own motion.

[7] To the extent the factual basis for this claim was available to defense counsel and counsel failed to raise and litigate this claim at trial or on appeal, counsel rendered deficient performance and Petitioner was actually prejudiced thereby.

25

constitutional rights, and acted improperly with regard to Petitioner's behavior and statements in jail.

33.     This misconduct rendered Petitioner's guilt/innocence and sentencing proceedings unconstitutional and, thus, his conviction is unconstitutional and his death sentence unreliable.

**Claim Three:       Misconduct On The Part Of The Jurors Violated Petitioner's Rights Under The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution And Related Precedent.**

34.     All other claims and allegations in this Petition are incorporated herein by this reference.

35.     Misconduct on the part of the jurors included, but was not limited to, improper consideration of matters extraneous to the trial, improper racial attitudes which infected the deliberations of the jury, false or misleading responses of jurors on voir dire, improper biases of jurors which infected their deliberations,  improper exposure to the prejudicial opinions of third parties, improper communications with third parties, improper communication with jury bailiffs, improper ex parte communications with the trial judge, and improper prejudging of the

guilt/innocence and penalty phases of Petitioner's trial.[8]   *See e.g.*, *Spencer v. Georgia*, 500 U.S. 960, 960-61 (1991) (Kennedy, J., concurring in denial of certiorari) (regarding racial epithets used in jury room); *McCleskey v. Kemp*, 481 U.S. 279, 292-97 (1987) (laying out framework for analyzing racial animus of decisionmakers); *Rushen v. Spain*, 464 U.S. 114, 119-20 (1983) (emphasizing improper communications with trial judge can unconstitutionally prejudice defendant); *Turner v. Louisiana*, 379 U.S. 466 (1965) (denouncing improper communications with bailiffs); *Jones v. Kemp*, 706 F. Supp. 1534, 1558-60 (N.D. Ga. 1989) (finding jury's consideration of extraneous religious information to violate the defendant's constitutional rights); *Glover v. State*, 274 Ga. 213, 215 & n.11 (2001) (citing juror's consideration of extraneous legal research as misconduct requiring reversal of conviction); *Lucas v. State*, 274 Ga. 640, 647 (2001) (discussing framework for deciding whether a juror's untruthful answers at voir dire warrant reversal).

---

[8] To the extent that Petitioner's counsel failed to protect Petitioner's rights in this regard, counsel's performance was unreasonably deficient, and Petitioner was prejudiced by the deficiencies of his counsel.  To the extent that the trial court was implicated in or aware of any of the jury misconduct, and yet failed to advise Petitioner or correct the misconduct, the court's actions constitute an independent violation of Petitioner's rights.  To the extent that the State, through any of its entities, was implicated in or aware of any of the jury misconduct, the State's action (or failure to act) also deprived Petitioner of his constitutional rights.

36.     This misconduct rendered Petitioner's trial unconstitutional and thus his conviction and death sentence unreliable.   The jury's misconduct violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**Claim Four:          The Trial Court's Improper Rulings And Other Errors Deprived Petitioner Of A Fair Trial And Reliable Sentencing, In Violation Of The Fourth, Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution And Related Precedent.[9]**

37.     All other claims and allegations in this Petition are incorporated into this Claim by this reference.

38.     The trial court conducted all stages of Petitioner's trial — including pretrial proceedings, the guilt/innocence phase, and the (resentencing) penalty phase in a manner that violated his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  Errors committed by the trial court include, but are not limited to:

          a)     failing to possess and employ an accurate and proper understanding of what constitutes mitigation and what constitutes aggravation;

---

[9] To the extent trial counsel failed to raise and litigate these issues at trial or on appeal, counsel was ineffective and Petitioner was prejudiced thereby.

b)      allowing the introduction of illegally obtained statements and evidence;

c)      failing to curtail the improper and prejudicial arguments by the State;

d)      failing to require the jury to find aggravating evidence existed beyond a reasonable doubt;

e)      admitting into evidence various items of prejudicial, unreliable, unfounded, unsubstantiated, and/or irrelevant evidence tendered by the State;

f)      admitting improper evidence despite proper objections;

g)      refusing to allow admissible evidence;

h)      imposing an unconstitutional and disproportionate sentence;

i)      failing to require the State to disclose certain items of evidence in a timely manner so as to afford the defense an opportunity to conduct an adequate investigation;

j)      failing to require the State to disclose certain items of evidence of an exculpatory or impeaching nature to the defense;

k)      allowing the State to present false and misleading testimony;

l)      failing to find Georgia's practice of execution by lethal injection unconstitutional;

29

m)     failing to act upon known improprieties of defense counsel thereby allowing Petitioner to receive ineffective representation;

n)     failing to provide Petitioner with adequate counsel;

o)     permitting the prosecution to elicit extensive, irrelevant victim-impact evidence;

p)     impermissibly injecting comments during the testimony of witnesses and impermissibly questioning witnesses himself;

q)     allowing harmful prejudicial testimony by a State expert during the guilt/innocence phase of Petitioner's trial, in violation of *Estelle v. Smith*, 451 U.S. 454 (1981);

r)     admitting improper hearsay evidence;

s)     failing to excuse jurors who would not fairly consider all sentencing options;

t)     relying on a misunderstanding of the law in the court's rulings, report, and findings;

u)     excusing potential jurors for improper reasons under the rubric of hardship;

v)     restricting voir dire relating to several areas of inquiry;

w)     using improper definitions of mitigation during voir dire;

30

x)      admitting into evidence prejudicial and irrelevant photographs and videos;

y)      putting the burden on Petitioner to prove that he was not eligible for the death penalty;

z)      permitting prejudicial evidence of prior bad acts and similar transactions involving Petitioner;

aa)     failing to inquire into the possibility of juror misconduct and remedy such misconduct;

bb)     permitting the State to require Petitioner wear a stun belt at both phases of trial;

cc)     failing to hold a hearing on the use of the stun belt at Petitioner's resentencing;

dd)     permitting Petitioner's involuntary statements while in police custody to be admitted during the guilt/innocence phase and at the resentencing;

ee)     admitting materials relating to Petitioner's federal charges;

ff)     refusing to give proper jury instructions requested by Petitioner, including, but not limited to, instructions on accident and voluntary manslaughter;

gg)     refusing to strike prospective jurors who were unqualified for reasons such as, but not limited to, bias against the defense;

31

hh)     giving the jury erroneous and misleading instructions;

ii)     failing to rule that Petitioner could not be retried at his guilt/innocence trial or resentencing under the Double Jeopardy Clause;

jj)     providing the jury with misleading and prejudicial forms on which to note their verdicts and findings as to aggravation;

kk)     permitting the jurors to interact with the alternate jurors during deliberations;

ll)     improperly restricting the scope of voir dire;

mm)     improperly rehabilitating prospective jurors;

nn)     failing to declare a mistrial or issue curative instructions when the State made improper and prejudicial statements in argument;

oo)     allowing the prosecution to introduce improper, unreliable and irrelevant evidence, including evidence of which the defense had not been provided adequate notice and which had been concealed from the defense;

pp)     failing to set aside the jury panel which did not fairly represent the constituents of Gwinnett County and under-represented several minority groups, in violation of the Sixth Amendment to the United States Constitution;

qq)     sustaining the State's objection to defense counsel's question regarding jurors' feelings regarding the charge of murder and life sentences;

32

rr)     allowing jurors who could not fairly consider all sentencing options to remain on the jury panel;

ss)     allowing documents related the Petitioner's prison record to go out with the jury;

tt)     failing to excuse for cause several jurors.

39.     Regarding the trial court's role during voir dire, under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant is entitled to an impartial jury, and not merely to jurors who swear to be indifferent. *Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father."); *see Smith v. Phillips*, 455 U.S. 209, 221-22 (1982) (O'Connor, J., concurring) ("[A] juror may have an interest in concealing his own bias and partly because the juror may be unaware of it."); *Jorden v. Lippman*, 763 F.2d 1265, 1274 (11th Cir. 1985) ("The juror is poorly placed to make a determination as to his own impartiality." (internal quotation marks omitted)).  The Constitution requires that a juror appear to be, as well as be, unbiased.  *Aldridge v. United States*, 283 U.S. 308, 315 (1931) ("[It is] more injurious to permit it to be thought that persons entertaining a disqualifying prejudice were allowed to serve as jurors . . . ."); *Estelle*, 425 U.S. at 503-04.

33

When the life or death of a criminal defendant is at stake, absolute neutrality on the part of the jurors is especially critical. *See generally Turner v. Murray*, 476 U.S. 28, 34-35 (1986); *Gardner v. Florida*, 430 U.S. 349, 358 (1977).  The court failed to provide Petitioner with such a neutral jury.

**Claim Five:**      **Petitioner Was Denied Due Process Of Law By The Instructions Given To The Jury At Both Phases Of His Capital Trial, In Violation Of The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution And Related Precedent.**

40.    All other claims and allegations in this Petition are incorporated herein by this reference.

41.    Under the Eighth Amendment, "death is a punishment different from all other sanctions in kind rather than in degree." *Woodson v. North Carolina*, 428 U.S. 280, 303-04 (1976).  Accordingly, the United States Supreme Court has recognized that, under the Eighth Amendment and state law, sentencers require "different," *i.e.*, especially clear, instructions at the penalty phase of a capital trial. *See Penry v. Lynaugh*, 492 U.S. 302, 323 (1989) (requiring special instructions about mental retardation); *abrogated in part on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002)[10]; *Mills v. Maryland*, 486 U.S. 367, 384 (1988)

---

[10] *Penry* has been cited many times over with approval post-*Atkins* by the Supreme Court of the United States.  *See, e.g.*, *Tennard v. Dretke*, 542 U.S. 274, 278 (2004).

(invalidating instructions on mitigating circumstances which "reasonable jurors" could have misunderstood); *Maynard v. Cartwright*, 486 U.S. 356, 363-66 (1988) (invalidating vague instructions on a statutory aggravating circumstance); *Godfrey v. Georgia*, 446 U.S. 420, 422, 429-33 (1980) (plurality opinion) (requiring limiting instructions about Georgia's aggravating circumstance that murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim").

42.   The jury instructions at both phases of the trial in this case, both individually and collectively, were ambiguous, insufficient, vague, confusing, and contrary to law, and the jurors' decisions based upon these instructions are unreliable, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.[11]   The trial court erred in numerous ways during its charge to the jury including, but not limited to:

Guilt/Innocence

---

[11] To the extent Petitioner's counsel failed adequately to preserve objections to the trial court's charge or effectively litigate these issues on appeal, counsel rendered ineffective assistance.  Had counsel performed reasonably, there is a reasonable probability that the outcome of Petitioner's trial would have been different.

35

a)      incorrectly charging the jury on the burden of proof beyond a reasonable doubt, ultimately permitting the jury to convict Petitioner upon less than "utmost certainty" of guilt;

b)      giving an improper charge on impeachment of witnesses;

c)      instructing the jury on inappropriate and inapplicable matters;

d)      incorrectly instructing the jury on the consequences of certain verdicts;

e)      improperly instructing the jury on charges which merged into one offense;

f)      failing to instruct the jury on lesser included offenses, such as manslaughter;

g)      improperly charging vague and essentially standardless definitions of statutory terms;

h)      improperly charging the jury on the offenses charged in the indictment.

<u>Mitigating Circumstances</u>

i)      Improperly instructing the jury regarding the definition of mitigating evidence, to wit:

> You shall also consider the facts and circumstances, if any, in extenuation, mitigation, or aggravation of punishment.
>
> Now, mitigating or extenuating facts or circumstances are those which you, the jury, find do not constitute a justification or excuse for the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame.

(Resp. Ex. 87-A, at 68).  The court's definition of mitigation is too preclusive in that it suggests the sentencer is restricted to consideration of offense-related mitigation and cannot consider background and social history as mitigation.  In *Lockett v. Ohio*, the United States Supreme Court held that the defendant in a capital trial has the right to introduce virtually any evidence in mitigation during the penalty phase of trial.  438 U.S. 586, 604-05 (1978) (plurality opinion).  Any instruction arbitrarily limiting what may be considered as mitigation, as was given here, is thus rendered unconstitutional.  *Id.*  The court in this case also instructed the jury that it should "consider the facts and circumstances, *if any*, in extenuation, mitigation, or in aggravation of punishment."  (Resp. Ex. 87-A, at 68 (emphasis added)).  This instruction improperly implied to the jury the court's belief that no facts warranting mitigation existed and, therefore, invaded the province of the jury.

j)    A jury instruction on mitigating circumstances is constitutionally invalid if there is *any* "reasonable possibility that a juror will

misunderstand the meaning and function of mitigating circumstances . . . ." *Peek v. Kemp*, 784 F.2d 1479, 1494 (11th Cir. 1986) (*en banc*). Where mitigating evidence is present, "the absence of any explanatory instructions on mitigation creates a reasonable possibility that the jury misunderstood the meaning and function of the mitigating evidence in the sentencing deliberations." *Cunningham v. Zant*, 928 F.2d 1006, 1012 (11th Cir. 1991). At Petitioner's sentencing hearing, the trial court failed to (1) provide even the most basic examples of mitigating circumstances; (2) explain that even a minimum quantum of mitigating evidence, under the law, could be considered by the jury in reaching a life sentence; (3) explain that anything could be considered in mitigation; (4) explain that, unlike the guilt/innocence phase of the trial, there was no need for the jury to weigh mitigating evidence against any aggravating evidence; and (5) explain that mitigating circumstances could be relevant to punishment and not merely the degree of culpability or blame.

k)      There is no constitutional requirement that evidence mitigating against a sentence of death be introduced at the penalty phase, as opposed to the guilt phase. The Eighth Amendment mandates that a capital sentencing jury be free to consider *any* mitigating evidence, irrespective of who introduces it, when it is introduced, or how it is introduced. *See, e.g.*, *Franklin v. Lynaugh*, 487 U.S.

38

164, 174 (1988) (plurality opinion) (noting that the jury is permitted to consider evidence of a defendant's character and record or of the circumstances of the offense presented at the guilt phase when considering a sentence).  There *was* evidence presented at Petitioner's guilt/innocence phase that was also relevant to mitigation presented to Petitioner's sentencing jury (though not adequately presented as such due to the ineffective performance of Petitioner's counsel).  His sentencing jury, however, was not told what that mitigating evidence was, why it should be considered, or its significance.  Nor was the jury provided helpful, concrete examples of a mitigating circumstance.  *Cf. Peek*, 784 F.2d at 1490-91. Because there *was* mitigating evidence presented, "the absence of any explanatory instructions on mitigation create[d] a reasonable possibility that the jury misunderstood the meaning and function of the mitigating evidence in the sentencing deliberations."  *Cunningham*, 928 F.2d at 1012.

l)     The sentencing-phase instruction on mitigating circumstances thus effectively violated the rule established in the companion cases of *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Bell v. Ohio*, 438 U.S. 637 (1978).  *Lockett* and *Bell* invalidated the Ohio death-penalty statute because it did not permit sufficient individualized consideration of mitigating factors.  *Lockett* held that the Eighth and Fourteenth Amendments require that a sentencing jury not be precluded from

considering *any* relevant mitigating factor.  438 U.S. at 604.   In a subsequent case, *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982), the Court reaffirmed its holding in *Lockett* and vacated the death sentence because, as in Petitioner's case, "it was as if the trial judge had instructed a jury to disregard the mitigating evidence [the defendant] proffered on his behalf."  *Id.*

      m)   One of the most fundamental Eighth Amendment principles is that the jury's discretion in a capital case must be guided by "clear and objective standards," *see Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (internal quotation marks omitted), and that the sentencer cannot be precluded from considering, as a mitigating factor, any aspect of the defendant's character or record or any of the circumstances of the offense.  *Lockett*, 438 U.S. at 604.   Furthermore, the instructions at the penalty phase of a capital case must provide the jury with a "vehicle for expressing its reasoned moral response" to any available mitigating evidence relevant to the defendant's "background or character or the circumstances of the crime . . . ."  *Franklin*, 487 U.S. at 184 (O'Connor J., concurring) (internal quotation marks omitted).   The Court reaffirmed its commitment to this basic principle in *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989).   Thus, beyond simply allowing a defendant to present mitigating evidence, "[t]he sentencer must also be able to consider and give effect to that evidence in imposing [the] sentence."  *Id.*;

40

*see also Smith v. Texas*, 550 U.S. 297, 315-16 (2007); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246-56 (2007).

n)     In *Penry* the Court held that the Texas instructions before it were defective because they did not provide the jury with a mechanism to consider Penry's evidence of mental retardation and child abuse.  The Court concluded:

> In this case, in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty, we conclude that the jury was not provided with a vehicle for expressing its reasoned moral response to that evidence in rendering its sentencing decision.  Our reasoning in *Lockett* and *Eddings* thus compels a remand for resentencing so that we do not risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.

*Penry*, 492 U.S. at 328 (internal quotation marks and citations omitted).

o)     As in *Penry*, the jury instructions here failed to explain adequately the nature and function of mitigating circumstances and also created a constitutionally impermissible risk that Petitioner's sentencing jury failed to consider all available mitigating circumstances, though they may not have been adequately presented as such by defense counsel.  This is especially true in this case, because the Georgia death-penalty statute does not include statutory

41

mitigating circumstances.  In this case, the prosecutor lectured the jurors on each of the aggravating circumstances he wanted them to find.  (Resp. Ex. 87-A, at 19-22). The trial court then gave the jury a lengthy charge on specific aggravating circumstances (*id.* at 68, 75-76), as well as a copy of the statutory aggravating circumstances charges (*id.* at 81), but gave the jury only brief, vague language regarding mitigating circumstances.  Thus, it is possible that a reasonable jury could have failed to understand that it could consider any aspect of Petitioner's character and background in mitigation of punishment.

p)    The Supreme Court has consistently made it clear that jury instructions which preclude the sentencer's consideration of mitigating circumstances violate the Eighth Amendment.  *See, e.g.*, *Hitchcock v. Dugger*, 481 U.S. 393, 398-99 (1987).  *Peek* is not to the contrary.  The relevant part of the court's instructions in *Peek* was not only considerably more detailed than the charge in this case, but, significantly, the trial judge gave the jury an example of a mitigating circumstance — the absence of a prior criminal record.  784 F.2d at 1490-91.  So whereas the charge in *Peek* contained a "helpful, common sense example of aggravating and mitigating evidence," *id.* at 1490, the same cannot be said of the charge in this case.  Furthermore, since the Eleventh Circuit sitting *en banc* decided *Peek*, the Supreme Court of the United States has decided *Hitchcock*,

42

*Mills*, *Franklin*, and *Penry*.  These decisions make clear that a court must carefully scrutinize the instructions at the penalty phase of a capital trial in order to insure that all mitigating evidence is properly considered.  Careful scrutiny of the record of Petitioner's sentencing proceeding demonstrates that the instructions given there effectively ensured that the available mitigating evidence would not be considered by his jury.  Petitioner's death sentence cannot stand.

### Aggravating Circumstances

q)     The trial court's ambiguous instructions concerning aggravating circumstances led the jurors to believe they could sentence Petitioner to death without finding any statutory aggravating circumstances.  The court charged as follows: "You shall also consider the facts and circumstances, *if any*, in extenuation, mitigation, or aggravation of punishment."  (Resp. Ex. 87-A, at 68 (emphasis added)).  Such an instruction was confusing and misleading, in that the jurors were told that they could sentence Petitioner to death in the absence of any aggravating circumstances.  While the court repeatedly instructed the jury that it could sentence Petitioner to death if it found an aggravating circumstance or circumstances, the court's failure to instruct the jurors on what constituted mitigating evidence resulted in a jury charge that instructed the jurors how to sentence Petitioner to death, but failed to instruct them how to sentence him to life.

43

The court went to great lengths to instruct the jury on aggravating factors and provided the jury with a written copy of the court's charge. (Resp. Ex. 87-A, at 68, 75-76, 81). Noticeably absent from the court's instruction, however, was the idea that the mitigating circumstances could reduce the *punishment*, and not just moral culpability or blame.

   r)  The trial court thus utterly failed in its constitutionally imposed duty to "guide and focus the jury's consideration of mitigating circumstances." *Peek*, 784 F.2d at 1494. While an explicit definition of mitigating circumstances and their function is not required in every case, what is required is that "it be clear from the jury instructions considered in context that a reasonable jury could not have misunderstood the meaning and function of mitigating circumstances." *Id.* at 1494 n.16. In Petitioner's case, there exists a reasonable possibility that the meaning and function of mitigating circumstances were lost on a jury who was instructed that mitigation went to moral culpability or blame, but who were not told that mitigation was relevant in the consideration of punishment. The outcome of Petitioner's sentencing hearing was clearly and actually prejudiced by the improper and inadequate instructions.

   s)  The jurors were also given absolute unbridled discretion to impose life or death for any reason or no reason at all, upon the finding of one

statutory aggravating circumstance.  This unbridled discretion is prohibited by the Eighth and Fourteenth Amendments, and produced unreliable results in this case. This error was compounded by the fact that the jurors were given vague instructions on the statutory aggravators they were to consider, in violation of the Eighth and Fourteenth Amendments.

### **Unanimity**

t)      In its charge to the jury at sentencing, the trial court stated that "your verdict as to penalty must be unanimous . . . ."  (Resp. Ex. 87-A, at 80).  The trial court's instructions regarding unanimity of the sentence were an incorrect statement of the law.  In a murder prosecution where the jury may impose only life imprisonment or death, "if the convicting jury is unable to agree on which of those two sentences to impose, the trial judge must impose the lesser, life imprisonment."  *Miller v. State*, 237 Ga. 557, 559 (1976)*; see also, Hill v. State*, 250 Ga. 821, 821 (1983).  Thus, if just one juror believes that a death sentence is inappropriate, the jury cannot recommend the death penalty and the trial court must impose a sentence of life imprisonment.

u)      The effect of instructing the jury that its sentencing verdict had to be unanimous was to pressure holdout jurors who might otherwise have been prepared to sentence Petitioner to life imprisonment to vote for a sentence of death

in an effort to achieve unanimity.  Therefore, by effectively instructing the jury that a life verdict required unanimity, and thereby failing adequately to enlighten the jurors of the consequences of non-unanimity, the trial court denied Petitioner his Sixth, Eighth, and Fourteenth Amendment rights.

43.   These erroneous and improper instructions violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[12]

**Claim Six:**     **The Death Penalty In Georgia Is Imposed Arbitrarily And Capriciously And Disproportionately And Amounts To Cruel And Unusual Punishment, Violating Petitioner's Rights Under The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution And Related Precedent.**

44.   All other allegations in this Petition are incorporated herein by this reference.

45.   While the Georgia death-penalty scheme invalidated by *Furman v. Georgia*, 408 U.S. 238 (1972), has been changed, the arbitrariness in its imposition

---

[12] To the extent that Petitioner's counsel failed adequately to preserve objections to the trial court's charge or effectively litigate these issues on appeal, Petitioner's counsel rendered ineffective assistance. Had counsel performed reasonably, there is a reasonable probability that the outcome of Petitioner's trial would have been different.

continues.[13]   Georgia's statutory procedures, as applied, do not result in fair, consistent, and nondiscriminatory imposition of the death penalty, and therefore violate the Eighth Amendment to the United States Constitution and the corresponding provisions of the Georgia Constitution.  The Georgia Statute which authorizes the imposition of the death penalty requires that the jury make certain findings before it can impose a sentence of death.  *Gregg v. Georgia*, 428 U.S. 153 (1976) (holding that the Georgia capital sentencing system, particularly the proportionality review, substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury); *see* O.C.G.A. § 17-10-30(b), (c).  However, the State, by and through the district attorney, still has the discretion and authority to determine when and if the death penalty would be sought.

46.   Petitioner's sentence of death was imposed arbitrarily and capriciously, and pursuant to a pattern and practice of discrimination in the administration and imposition of the death penalty in Georgia, thereby rendering

---

[13] In its Special Report, *A Matter of Life or Death*, the Atlanta Journal-Constitution found that the death penalty in Georgia remains arbitrary due to disparities in race, gender, geography, and to prosecutorial discretion.  *See* Bill Rankin et al., *A Matter of Life or Death:  An AJC Special Report*, ATLANTA J.-CONST., Sept. 23, 2007, at AI, *available at* 2007 WLNR 18647379 ("'It's like a roulette wheel,' said former Georgia Chief Justice Norman Fletcher.  'Arbitrariness is a weakness of the death penalty.'").  In addition to finding that sentences varied widely based on district attorneys' decisions to seek death, the Report specifically profiled Danny Porter, who prosecuted Petitioner's case, as one who aggressively seeks the death penalty.  *See* Sonji Jacobs, *A Matter of Life or Death:  An AJC Special Report*, ATLANTA J.-CONST., Sept. 25, 2007, at J1, *available at* 2007 WLNR 18768795.

Petitioner's sentence of death unlawful and in violation of Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.   The grounds for this claim include, but are not limited to, the following:

a.   Georgia's statutory death penalty procedures, as applied, do not result in fair, nondiscriminatory, or proportional imposition of the death penalty, and therefore violate the Eighth Amendment to the United States Constitution;

b.   The death penalty is imposed arbitrarily, capriciously, and discriminatorily in the State of Georgia, and was so imposed in Petitioner's case;

c.   Georgia cases similar to that of Petitioner's with regards to both the nature and circumstances of the offense, prior record, culpability and life and character of the accused, have resulted in lesser punishments than death;

d.   Georgia cases more aggravated than that of Petitioner's with regards to both the nature and circumstances of the offense, prior record, culpability, and life and character of the accused, have resulted in lesser punishments than death;

e.   There is no constitutionally permissible way to distinguish the few cases in which the death penalty has been imposed, and Petitioner's case in

48

particular, from the many similar cases in which a lesser punishment has been imposed;

       f.     In the United States and, specifically, in the State of Georgia, the death penalty has been and continues to be imposed discriminatorily against African-Americans, males, and poor persons, and Petitioner's sentence of death was imposed because he is an indigent, Hispanic male;

       g.     There exists in Georgia a pattern and practice of prosecuting authorities, courts, and juries discriminating on the basis of race, gender, and poverty in deciding whether to seek or impose the death penalty in cases similar to that of Petitioner's, thereby making the imposition of the sentence of death against Petitioner a violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

       47.    As early as 1910, the Supreme Court noted that "it is a precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Weems v. United States*, 217 U.S. 349, 367 (1910).  Implicit in the notion that the punishment should be proportionate to the crime is that the character and culpability of the offender should be considered along with the nature of the offense.  *See Hitchcock*, 481 U.S. at 398-99; *Lockett*, 438 U.S. at 605. The recognition that there must be a meaningful basis for distinguishing the cases

of those few who were death-sentenced from the many who were not became the bedrock of proportionality review.

48.     Since *Furman v. Georgia*, 408 U.S. 238, 310, 313 (1972) (Stewart, J. concurring, White, J., concurring), the United States Supreme Court has required states that permit capital punishment to institute procedures that protect against the "wanton" and "freakish" imposition of the death penalty and provide a "meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *Id.* In later overturning a Florida death sentence on what amounted to proportionality grounds, the United States Supreme Court emphasized:

> "If a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." *Spaziano v. Florida*, 468 U.S. 447, 460 (1984). The Constitution prohibits the arbitrary or irrational imposition of the death penalty. *Id.* at 466-467. We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally. *See, e.g.*, *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990) (citing cases); *Gregg v. Georgia*, 428 U.S. 153 (1976).

*Parker v. Dugger*, 498 U.S. 308, 321 (1991).

49.     While a proportionality review is not constitutionally required where it is not part of the state's statutory scheme for fair imposition of the death penalty,

50

*Pulley v. Harris*, 465 U.S. 37, 42-44 (1984), in Georgia, a proportionality review is such a statutory requirement, and it was one of the pillars of reliability in sentencing used by the Supreme Court to uphold the Georgia death penalty statute in *Gregg v. Georgia*, 428 U.S. 153 (1976). *See also* O.C.G.A. § 17-10-35(c)(3). The Supreme Court of Georgia has accordingly noted that it "will not affirm a sentence of death unless in similar cases throughout the state the death penalty has been imposed generally and not wantonly and freakishly." *Horton v. State*, 249 Ga. 871, 880 (1982) (internal quotation marks omitted).

50.   The proportionality review conducted in the State of Georgia is constitutionally infirm in general and as applied. *See Walker v. Georgia*, 129 S. Ct. 453 (2008) (Stevens, J., statement respecting denial of certiorari).   The constitutional mandate against disproportionate sentencing does not merely require that the Supreme Court of Georgia and courts reviewing that court's orders be able to find other instances in which the death penalty is applied to similar facts, but rather, to view the state system as a whole to see that sentences are proportionate across the spectrum.   There are many other murders much more excessive and aggravated than that for which Petitioner has received a sentence of death, yet the defendants in those case received life sentences or less.   These life sentences were never considered by the Supreme Court of Georgia in its proportionality review.

51

To conduct an equitable proportionality review, it is critical that this Court review other similarly situated defendants in cases where life sentences resulted.   Such review is even more important with murders incident to armed robberies, where sentences are frequently even more varied.[14]   If the list of comparators is broadened to include all cases where death has occurred, whether the sentence was death or life imprisonment, this Court will see further evidence that far more heinous, torturous, and aggravated murders have resulted in life sentences.

51.    Further, the Atlanta Journal-Constitution's recent report on the death penalty in Georgia revealed that the Supreme Court of Georgia's proportionality review is further flawed by its continued reliance on cases that have been overturned.  *See* Bill Rankin et al., *A Matter of Life or Death: An AJC Special Report*, ATLANTA J.-CONST., Sept. 26, 2007, at A1, *available at* 2007 WLNR 18842782.  Thus, not only has the Supreme Court of Georgia refused to hear cases where life sentences are imposed, the cases the court does rely upon often involve death sentences that subsequently were found unconstitutional. These systemic

---

[14] The AJC's Special Report also found that armed-robbery murders showed the least consistency as to whether the defendant would receive a sentence of life or death. *See* Heather Vogell & Bill Rankin, *A Matter of Life or Death:  An AJC Special Report*, ATLANTA J.-CONST., Sept. 25, 2007, at A1, *available at* 2007 WLNR 18768548. In Petitioner's case, the victim's death stemmed from an armed robbery but was even more mitigated than most:  the shooting was unintentional.

flaws in the high court's proportionality review undermine the notion that Georgia can prevent arbitrary and unconstitutional application of the death penalty.

52.    The goals of a proportionality review are to ensure that similarly situated defendants receive similar sentences, that the process be rational and not capricious, and that the ultimate sentence which the State can exact from a criminal be reserved for the most severe of murders.  That is why the death penalty should be precluded in this case.  A death sentence on this record would be clearly arbitrary and capricious because there is no reason supplied to distinguish why Petitioner deserves a death sentence despite the existence of numerous other, more culpable defendants who received life imprisonment despite committing more aggravated crimes with less mitigating evidence, having long histories of criminal misconduct, and facing far more direct and overwhelming evidence of actual guilt. Accordingly, this Court should reverse Petitioner's sentence of death.

**Claim Seven:**    **Petitioner Was Denied Due Process Of Law When Being Forced To Wear A Stun Belt During Both Phases Of His Trial, In Violation Of The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution And Related Precedent.**

53.    All other claims and allegations in this Petition are incorporated herein by this reference.

53

54.     Petitioner's rights to due process, the presumption of innocence, the effective assistance of counsel, and a fair trial were violated when he was required to wear a stun belt throughout the proceedings of his 1997 and 2002 trials based on the State's assertion that Petitioner posed a security risk.  Although the trial court conducted a hearing in 1997 before denying Petitioner's Motion to Prevent Use of Stun Belt, the court refused to reconsider thoroughly the issue when it was re-raised by Petitioner in 2002.  The court allowed use of the stun belt despite no new showing of the State's security interest and trial counsel's proffer of recent case law limiting the use of these devices.  *See United States v. Durham*, 287 F.3d 1297, 1306-09 (11th Cir. 2002) (requiring the decision to subject a defendant to use of a stun belt to be closely scrutinized and concluding the court made insufficient factual findings to justify the burden on the defendant's rights).

55.     Courts have long sought to minimize the use of physical restraints on criminal defendants during court proceedings, both due to the restraints' prejudicial effect on the jury and the inherent risk that such restraints will impede a defendant's ability to participate fully in court proceedings.  *See Deck v. Missouri*, 544 U.S. 622, 626-30 (2005) (discussing the Court's historic and continuing disfavor of shackling); *see also Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986) (suggesting that the presence of security guards, rather than physical restraints on a

54

defendant, is less likely to interfere with the defendant's right to a fair trial); *Illinois v. Allen*, 397 U.S. 337, 344 (1970) (recognizing that a defendant's right to be present at his own trial affects the extent to which a court may restrain him, in light of potential prejudice to the defendant by being restrained before a jury and by being unable to participate in his defense).  Further, the Supreme Court of the United States has held that due process equally prohibits shackling of a defendant during the penalty phase of a capital trial even after the jury has found him guilty. *See Deck*, 544 U.S. at 632.

56.   In *Deck*, the Supreme Court of the United States reversed the petitioner's death sentence when he was shackled during resentencing because no specific state interest justified this otherwise highly prejudicial practice.  *Id.* at 634-35.  Further, the Court held that, if use of the restraint is unjustified, no further showing of prejudice is required, as "the practice will often have negative effects that 'cannot be shown from a trial transcript.'"  *Id.* at 635 (quoting *Riggins v. Nevada*, 504 U.S. 127, 137 (1992)).  Although the Court's ruling applied to visible restraints, its reasoning relied in part on the idea that physical restraints impinge on the right to counsel under the Sixth Amendment.  "Shackles can interfere with the accused's ability to communicate with his lawyer.  Indeed, they can interfere with a defendant's ability to participate in his own defense, say, by freely choosing

whether to take the witness stand on his own behalf." *Id*. at 631 (internal quotation marks and citations omitted).  A stun belt, which can give the wearer a powerful shock, equally affects a defendant's ability to communicate with counsel and participate in his defense.  Moreover, although the stun belt may be a more subtle form of restraint than traditional shackling, it may still be visible to the jury during the proceedings, thus raising the same concerns of prejudice.  Accordingly, whether or not the jury was aware of Petitioner's stun belt, Petitioner's constitutional rights were impinged upon by being forced to wear it.

57.    Further, the Eleventh Circuit has cautioned courts on the use of stun belts, specifically noting that, "[e]ven if the physical restraints placed upon the defendant are not visible to the jury, they still may burden several aspects of a defendant's right to a fair trial." *Durham*, 287 F.3d at 1304.  After a discussion of the belt's operation[15] and the constitutional implications of its use, the Eleventh Circuit concluded that:

----

[15] While no factual findings were made by the district court regarding the operation of the stun belt, relying on Durham's claims, the court noted the following:

> (1) when activated, [a stun belt] administers a 50,000-70,000 volt shock for approximately eight seconds, (2) the power of such a shock causes the wearer to lose control of his limbs, and often to urinate or defecate on himself, and (3) the belt protrudes some three inches from the wearer's back, causing some degree of discomfort to the wearer.  Durham also contends that the belts have been known to malfunction, and that there have been several

> [S]tun belts plainly pose many of the same constitutional concerns as do other physical restraints, though in somewhat different ways.  Stun belts are less visible than many other restraining devices, and may be less likely to interfere with a defendant's entitlement to the presumption of innocence.  However, a stun belt imposes a substantial burden on the ability of a defendant to participate in his own defense and confer with his attorney during a trial.  If activated, the device poses a serious threat to the dignity and decorum of the courtroom.

*Id.* at 1306.  The court accordingly held that a decision to use a stun belt must be subjected to "at least the same close judicial scrutiny" required for the use of other physical restraints.  *Id.* (internal quotation marks omitted).  It opined that courts should make factual findings about the operation of the stun belt, and consider whether an essential state interest is served by compelling a defendant to wear a belt, as well as whether there is a less restrictive method of restraint.  *Id.* at 1307-08.

58.    In Petitioner's November 26, 1996 pretrial hearing, the trial court heard evidence regarding the operation of the stun belt and ruled that it was

---

instances where the device has accidentally been triggered during trials.

*Durham*, 287 F.3d at 1305.

57

appropriate based on an alleged threat made by Petitioner, the severity of the crimes charged, and the Gwinnett County Sheriff's belief that Petitioner posed a security risk.    Even assuming *arguendo* these circumstances constituted an essential state interest in 1996, the court relied on its previous ruling in Petitioner's 2002 retrial without requiring the State to articulate any specific current security interest.    The court relied on its faulty and inaccurate recollection of the 1996 evidence and the erroneous assumption that the characteristics of Petitioner, his case, and any danger presented by him were unchanged between 1996 and 2002. Accordingly, Petitioner's federal and state due process rights were violated when he was forced to wear a stun belt without sufficient justification; his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were similarly violated.    Because the State cannot show that the error was harmless, *id.* at 1308-09, Petitioner is entitled to relief.[16]

---

[16] To the extent defense counsel failed to litigate this issue effectively at trial or on appeal, counsel performed ineffectively and Petitioner was actually prejudiced thereby.

**Claim Eight:**     **Each Phase Of Petitioner's Trial Was Fraught With Procedural And Substantive Errors Which, Viewed Cumulatively, Cannot Be Harmless Because The Combination Of Errors Deprived Him Of The Fundamentally Fair Trial Guaranteed By The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution And Related Precedent.**

59.     All other claims and allegations in this Petition are incorporated herein by this reference.

60.     "The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005) (internal quotation marks omitted).  In this case, because of the errors outlined above in Petitioner's pretrial, trial, and appellate proceedings, taken together, Petitioner was not "afforded a fundamentally fair trial." *Morris v. Sec'y, Dep't of Corrs.*, 677 F.3d 1117, 1132 (11th Cir. 2012); *see Sims v. Singletary*, 155 F.3d 1297, 1314 (11th Cir. 1998) (addressing a cumulative-error claim in a federal habeas petition).

61.     The cumulative effect of the errors in Petitioner's case are especially worthy of redress because of the uniqueness and gravity of the sentence Petitioner faces.  Death is "an unusually severe punishment, unusual in its pain, in its finality, and in its enormity." *Furman*, 408 U.S. at 287 (Brennan, J., concurring).  It differs

59

from all other sentences "not in degree but in kind."   *Id.* at 306 (Stewart, J., concurring).  "It is unique in its total irrevocability."   *Id.*  As a result, a sentence of death "mandates careful scrutiny in the review of any colorable claim of error." *Zant v. Stephens*, 462 U.S. 862, 885 (1983).

62.   Cumulative error in a capital case must be considered by examining errors at all stages in the proceedings because errors at one stage can prejudice a later stage.  *Cf. Sims*, 155 F.3d at 1314.

63.   It is the State's burden to prove the errors, even in the aggregate, were harmless.  *Baker*, 432 F.3d at 1223.

64.   Here, each of the errors detailed above, even if they do not individually mandate relief, snowballed from pretrial, to Petitioner's first trial, to Petitioner's resentencing, into a fundamentally unfair trial and result for Petitioner. The State cannot meet its burden of proving no harm resulted.  For this reason alone, relief is imperative.

**Claim Nine:**       **The Execution Of Petitioner By Lethal Injection Is Cruel And Unusual Punishment, In Violation Of His Rights Under The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution And Related Precedent.**

65.   All other claims and allegations in the direct appeal briefs, state habeas pleadings, and in this Petition are incorporated herein by this reference.

60

66.    The State of Georgia intends to execute Petitioner absent any judicial oversight or accessibility to information regarding the source and quality of the drugs utilized in the execution or the professional qualifications of those who will administer the execution.

67.    O.C.G.A. § 42-5-36(d) was signed by Governor Nathan Deal on May 7, 2013, and became effective as of July 1, 2013.  *See* 2013 Ga. Laws 333.  It provides in pertinent part:

> (d)(1) As used in this subsection, the term "identifying information" means any records or information that reveals a name, residential or business address, residential or business telephone number, day and month of birth, social security number, or professional qualifications.
>
> (2) The identifying information of any person or entity who participates in or administers the execution of a death sentence and the identifying information of any person or entity that manufactures, supplies, compounds, or prescribes the drugs, medical supplies, or medical equipment utilized in the execution of a death sentence shall be confidential and *shall not be subject to disclosure under [Georgia's open records law] or under judicial process*. Such information shall be classified as a confidential state secret.

O.C.G.A. § 42-5-36(d) (emphasis added).

68.    Because the Georgia Department of Corrections has hidden behind this Lethal Injection Secrecy Act to withhold information regarding the source and

61

quality of the drugs it intends to use for Petitioner's impending execution, it is impossible for Petitioner to determine whether the drugs that will be used to execute him are counterfeit, expired, or tainted in some way likely to cause him unconstitutionally grave harm or suffering during his execution.

69. Petitioner has reasonable cause for concern in this regard.  Since 2010, there has been an increasingly short supply of lethal injection drugs available to Departments of Corrections in the United States.  This is due to the creation of end-user agreements by major drug manufacturers in Europe who do not want to participate, through the use of their drugs, in capital punishment in the United States.[17]  To address this shortage in 2010 and 2011, the state of Georgia obtained illegally imported, expired, sub-potent drugs from a "pharmacy" operating out of the back room of a run-down driving school in London, England, for use in the state's now-defunct three-drug lethal injection protocol.[18]  The state of Georgia used these drugs in two executions before the Drug Enforcement Agency (DEA) raided Georgia's lethal injection drug supply and confiscated its illegally imported

---

[17] *See* Andrew Welsh-Huggins, *States:  Death penalty drug scramble, higher cost*, THE ASSOCIATED PRESS FOR BLOOMBERG BUS. WK., July 9, 2011, available at http://www.businessweek.com/ap/financialnews/D9OC9L100.htm  (last visited April 23, 2014).

[18] Kathy Lohr, *Georgia May Have Broken Law By Importing Drug*, NAT'L PUB. RADIO: MORNING EDITION, Mar. 17, 2011, available at  http://www.npr.org/2011/03/17/134604308/dea-georgia-may-have-broken-law-by-importing-lethal-injection-drug) (last visited April 23, 2014).

cache of drugs.   Both executions that used this supply of illegally imported, compromised drugs resulted in significant pain and suffering for the individuals executed.   In Brandon Rhode's case, his eyes remained open for the entirety of his execution, indicating that the illegally imported sodium thiopental used in his execution was sub-potent, leading to an "agonizing" execution for Mr. Rhode.[19]   In the case of Emmanuel Hammond, Mr. Hammond's eyes also opened during the procedure, and he appeared to be trying to communicate throughout the first part of his execution.[20]

70.   In the summer of 2011, Georgia switched its protocol from a three-drug protocol using sodium thiopental as the first drug in that cocktail to a second three-drug protocol utilizing pentobarbital as the first drug in the injection cocktail. The first execution to take place with this protocol was widely reported by objective, third-party sources to have caused tremendous suffering for Roy Blankenship, the person executed. The media reports of Mr. Blankenship's

---

[19] *WGXA.TV News Central*:  *Brandon Rhode Executed for 1998 Jones County Killings* (WGXA television broadcast Sept. 27, 2010) (available at http://www.wgxa.tv/story/brandon-rhode-executed-for-1998-jones-county-killings-20100927#axzz2yyqNBIDU) (last visited April 23, 2014) (interview between Fox News Reporters Portia Lake and Adam Hammond).

[20] Josh Green, *Witness to death:  Reporter's account of Hammond execution*, GWINNETT DAILY POST, Jan. 29, 2011, available at http://deathpenaltynews.blogspot.com/2011/01/georgia-executes-emmanuel-hammond.html (last visited April 23, 2014).

execution note that he grimaced, appeared to gasp for air, convulsed, and, like Mr. Hammond and Mr. Rhode, remained with his eyes open.[21]

71.    Responding to further drug shortages, the Georgia Department of Corrections changed its lethal injection drug protocol again on July 17, 2012.  This time, the change was from a three-drug protocol to a single-drug protocol employing only pentobarbital.[22]

72.    Based on its unseemly efforts in the past to obtain lethal injection drugs at any cost — even through illegal means — and its willingness to use patently expired drugs of unknown safety and origin on human beings, it is evident that the Georgia Department of Corrections has developed a culture of shoddiness and unprofessional conduct surrounding executions in this state and cannot prudently be trusted to obtain and use lethal injection drugs without any oversight. Moreover, the history of the Department of Corrections' changing its entire drug protocol on the eve of executions, combined with the state secrecy statute, gives

---

[21] *See, e.g.*, Greg Bluestein, *Ga. executes inmate convicted of Savannah slaying*, ASSOCIATED PRESS, June 23, 2011, available at http://seattletimes.com/html/nationworld/2015409385_apusgeorgiaexecution.html (last visited April 23, 2014).

[22] *Georgia switching to single-drug method for executions*, ASSOCIATED PRESS, July 17, 2012, available at http://www.northwestgeorgianews.com/rome/georgia-switching-to-single-drug-method-for-executions/article_7d38d020-4665-564d-aedb-b6656c56af4f.html (last visited April 23, 2014).

Petitioner no ability to predict what the Department of Corrections may do and what drugs it may use to execute him.

73.    Recent developments in Oklahoma even further illustrate the constitutional magnitude of problems that arise when a secrecy law shields a state's questionable, rapidly changing procedures from review.  When the Attorney General of Oklahoma secured a warrant for the execution of two inmates, Clayton Lockett and Charles Warner, lawyers for those inmates challenged Oklahoma's secrecy law, which is similar to Georgia's law.[23]  As a result, the Oklahoma Supreme Court stayed both executions pending further review.  But the stay did not last:  Oklahoma's governor decried the stay, and a state legislator called for the impeachment of the Supreme Court's justices.  The Oklahoma Supreme Court then entirely changed course, permitting the executions to proceed.[24]  The state employed a combination and dosage of drugs — midazolam, vecuronium bromide and potassium chloride — that had never before been used.[25]  The results were

---

[23] *See* Erik Eckholm, *One Execution Botched, Oklahoma Delays the Next*, N.Y. TIMES, Apr. 29, 2014, N.Y. Edition at A1, available at http://www.nytimes.com/2014/04/30/us/oklahoma-executions.html (last updated May 2, 2014).

[24] *See id.*

[25] *See* Cary A. Spinwall & Ziva Branstetter, *Fallin calls for 'independent review' as scrutiny falls on botched execution*, TULSA WORLD, Apr. 30, 2014, available at http://www.tulsaworld.com/news/state/medical-expert-inmate-was-still-conscious-and-

disastrous.   Ten minutes after Mr. Lockett's execution began at 6:23 p.m., a physician (who was present at the execution but did not administer the IV or drugs) declared Mr. Lockett unconscious.   Minutes later, according to numerous eyewitness reports, Mr. Lockett began to mumble and writhe, apparently in pain, then lift his head in an attempt to rise, while crying, "Man!"[26]   At 6:37, prison officials pulled a curtain in front of the witnesses.[27]   According to the physician, who did not even actually administer the procedures, Mr. Lockett experienced a "vein failure."[28]   Mr. Lockett died from an apparent massive heart attack some thirty minutes later.[29]   All of this occurred outside the view of eyewitnesses, Mr.

---

experienced-painful-execution/article_3d45f74c-d09c-11e3-9592-001a4bcf6878.html   (last updated May 1, 2014).

[26] *See* Eckholm, *supra* note 23; Spinwall & Branstetter, *supra* note 25; *see also Execution of Clayton Lockett fails, dies of heart attack, Charles Warner execution stayed 14 days*, KJRH TULSA, Apr. 29, 2014, available at http://www.kjrh.com/news/local-news/double-execution-planned-tuesday-night-for-2-oklahoma-inmates-clayton-lockett-and-charles-warner (last updated Apr. 30, 2014); Cary A. Spinwall & Ziva Branstetter, *Violent day preceded Clayton Lockett's execution*, TULSA WORLD, May 2, 2014, available at http://www.tulsaworld.com/news/state/violent-day-preceded-clayton-lockett-s-execution/article_1c634a5e-bf66-548a-a007-2f29ad3b949c.html (last updated May 2, 2014).

[27] *See* Eckholm, *supra* note 23.

[28] *See id.*

[29] *See id.*

Lockett's lawyers, and without meaningful judicial review.[30]   Harvard Medical School associate professor of anesthesiology Dr. David Waisel, who is familiar with lethal-injection procedures, has since opined that, based on the time lapse between the administration of the sedative midazolam and Mr. Lockett's physical reaction, "clearly this sounds like a new injection of something [after the midazolam] that was very painful."[31]   Mr. Lockett's execution manifestly was not carried out in a manner consistent with the Eighth Amendment to the United States Constitution.   The danger of such a botched execution occurring in Petitioner's case is great:  Georgia's Lethal Injection Secrecy Act, its ever-changing execution protocols, and its history of obtaining drugs from unregulated, sometimes illegal sources virtually guarantee that execution by lethal injection would violate Petitioner's constitutional right not to be subject to cruel and unusual punishment.

---

[30] Warner's execution has been stayed for fourteen days pending an investigation into the debacle.  *See id.*

[31] Ziva Branstetter, *Medical expert:  Inmate was still conscious and experienced painful execution*, TULSA WORLD, Apr. 30, 2014, available at http://www.tulsaworld.com/news/state/medical-expert-inmate-was-still-conscious-and-experienced-painful-execution/article_5715323a-d0d0-11e3-836e-0017a43b2370.html (last updated May 1, 2014).

74.     Georgia DOC's recent statement that any future executions in the state will be carried out in accordance with constitutional mandates,[32] without meaningful judicial review and independent investigation, cannot be trusted.  This is evident from the procedures the Department of Corrections, aided by the state legislature, have employed over the past several years.  The 2011 confiscation of Georgia's lethal injection drugs by the DEA was an embarrassment for the Department of Corrections, as well as for the office of the Attorney General, who defended the Department of Corrections' unconventional methods for procuring lethal-injection drugs in litigation before the courts of this state.   In order to prevent another such embarrassment and, in an attempt to further address the shrinking supply of drugs available for lethal injection on the conventional, FDA-regulated drug market, senior personnel from both the Department of Corrections and the Georgia Attorney General's office lobbied the Georgia General Assembly aggressively for passage of H.B. 122 (also referred to, herein, as O.C.G.A. § 42-5-36(d)).   That bill amended O.C.G.A. § 42-5-36 by adding clause (d), which identifies as a "confidential state secret" that "shall not be subject to disclosure under [Georgia's open records law] or under judicial process" any "identifying

---

[32] *See* Rose Scott, *Oklahoma "Botched Execution" and Georgia's Lethal Injection Secrecy Law*, WABE.ORG, Apr. 30, 2014, available at http://wabe.org/post/oklahoma-botched-execution-and-georgias-lethal-injection-secrecy-law (last visited May 2, 2014).

information" of any person or entity participating in or administering the execution or "any person or entity that manufactures, supplies, compounds, or prescribes the drugs, medical supplies, or medical equipment utilized in the execution of a death sentence . . . ." O.C.G.A. § 42-5-36(d); *see also* 2013 Ga. Laws 333.[33]

75.    Without any information regarding the origin or makers of the drug the Department of Corrections is planning to use to execute him, Petitioner is left with no means for determining whether the drugs for his lethal injection are safe and will reliably perform their function, or if they are tainted, counterfeited, expired, or compromised in some other way.  The Department of Corrections' recent switch from the use of FDA-approved pentobarbital to compounded pentobarbital[34] constitutes a significant change in its lethal injection protocol, and it is one that adds an unacceptable risk of pain, suffering and harm to Petitioner to the process of lethal injection.[35]

---

[33] A challenge to the constitutionality of the law is currently pending before the Supreme Court of Georgia in *Owens et al.*, *v. Hill*, Case No. S14A0092.

[34] *See* Kate Brumback, *Ga. to use compounding pharmacy for execution drug*, ASSOCIATED PRESS, July 11, 2013, available at http://onlineathens.com/local-news/2013-07-11/ga-use-compounding-pharmacy-execution-drug (last visited April 23, 2014).

[35] *See id.*

76.     Compounding pharmacies are not subject to stringent FDA regulations, and the sources from which they obtain the active pharmaceutical ingredients (APIs) for their drug concoctions are often part of the global "grey market," which is one of the leading sources for counterfeit drugs entering the United States.  Even if the API obtained and used by the compounding pharmacy is not counterfeit, there is a significant chance that it could be contaminated with bacteria, fungus, or particulate matter such as dirt or dust, all of which create a grave likelihood that the lethal injection process could be extremely painful for Petitioner, that he could suffer a severe allergic reaction and anaphylactic shock, that he would suffer and have a lingering death, or that the drugs would be sub-potent and harm or handicap him without actually killing him.

77.     The production of sterile injectable drugs, such as the pentobarbital that the Department of Corrections currently plans to use in future executions, is one of the most complex, risk-fraught operations of the modern pharmaceutical industry. Yet the great majority of compounding pharmacies that supply "sterile" injectibles have no way to test or assure the purity of the APIs they obtain for use in compounding and it is often difficult for a compounding pharmacist to know where the drug was manufactured, or under what conditions.  Most compounding pharmacies further lack the capability to purify the API or to sterilize the end

compounded product to ensure that it is free from fungus, bacteria, or other endotoxins and particulate matter. Even with the best compounding techniques, it is not possible to produce a sterile injectable suitable for use in humans from contaminated materials. Indeed a 2006 voluntary FDA survey of several compounding pharmacies[36] found that a large percentage of the products sampled from these organizations were contaminated, sub-potent, or unsuitable for pharmaceutical use in some way.[37]

78. Without information from the Georgia Department of Corrections regarding the identities and qualifications of suppliers, compounders, and prescribers of the lethal injection drugs that will be prepared for Petitioner's execution, Petitioner cannot know whether the pentobarbital with which the DOC intends to execute him (or any subsequent protocol the DOC adopts and shields from Petitioner's discovery and any meaningful judicial review) is appropriate for this purpose, or whether it is likely to cause him unconstitutional suffering and harm.

---

[36] Compounding pharmacies are largely outside the purview of the FDA and are regulated by the states.

[37] *See* U.S. Food & Drug Admin., *2006 Limited FDA Survey of Compounded Drug Products*, FDA.GOV, http://www.fda.gov/drugs/guidancecomplianceregulatoryinformation/pharmacycompounding/ucm204237.htm (last updated Mar. 22, 2010).

79.     The risk of inflicting severe and unnecessary pain and suffering upon Petitioner in the lethal injection process, as currently prescribed in Georgia, is high, and to subject a human being to such torture violates the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). Petitioner's execution should not be permitted via such methods as utilized by the Georgia Department of Corrections.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully prays that this Court:

1.     Review the claims alleged in this Petition on the merits;

2.     Issue a Writ of Habeas Corpus to have Petitioner brought before it to the end that he may be discharged from his unconstitutional confinement and restraint, and/or be relieved of his unconstitutional sentence of death;

3.     Grant Petitioner, who is indigent, sufficient funds to secure the expert and investigative assistance necessary to prove the facts as alleged in this petition;

4.     Grant Petitioner the authority to obtain subpoenas *in forma pauperis* for witnesses and documents necessary to prove the facts as alleged in this petition;

5.     Allow discovery, pursuant to Rule 6, Rules Governing Section 2254 Cases In the United States District Court;

6.     Conduct a hearing at which proof may be offered concerning the allegations of this petition;

7.     Allow Petitioner to amend his petition after the assistance of experts and discovery, and in the event of any other changes in the law or facts relevant to his case;

8.     Allow Petitioner to brief the merits of his claims based on the precedential and statutory law relevant to his case in light of the record and the allegations raised by this petition;

9.     Allow Petitioner to respond to any procedural or affirmative defenses, and to any other arguments that the Respondent might raise in this action; and

10.     Grant such other relief as may be appropriate.

Dated this 7th day of May, 2014.

Respectfully submitted,

_____
Brian S. Kammer (Ga. 406322)
Lauren Caudill (Ga. 857443)
Georgia Resource Center
303 Elizabeth Street, NE
Atlanta, GA 30307
404-222-9202; Fax 404-222-9212
Email: grc@garesource.org

COUNSEL FOR PETITIONER

73

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHAEL WADE NANCE,              )
     Petitioner,              )
                                )
vs.                              )          Civil Case No. 1:13-CV-04279-WSD
                                )
WARDEN,                          )
Georgia Diagnostic Prison,       )
     Respondent.              )

## NOTICE OF ELECTRONIC FILING

This is to certify that on May 7, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/EMF system, which will send electronic notice of the filing to Respondent's counsel:

Mitchell Watkins, Esq.
Assistant Attorney General
mwatkins@law.ga.gov

_____
Brian S. Kammer (Ga. 406322)
Lauren Caudill (Ga. 857443)
Georgia Resource Center
303 Elizabeth Street, NE
Atlanta, GA 30307
404-222-9202
grc@garesource.org