**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

MICHAEL WADE NANCE,  :
  Petitioner,    :  CIVIL ACTION NO.
         :  1:13-CV-4279-WBH
v.        :
         :  DEATH PENALTY
WARDEN OF THE GEORGIA :  HABEAS CORPUS
DIAGNOSTIC PRISON   :   28 U.S.C. § 2254
  Respondent.    :

## ORDER

Petitioner, a prisoner currently under a sentence of death by the State of Georgia, has pending before this Court his petition for a writ habeas corpus pursuant to 28 U.S.C. § 2254. The parties have completed their final briefs and the matter is now ready for final consideration by this Court.

## I. Background and Factual Summary

After his trial in Gwinnett County Superior Court, a jury convicted Petitioner of malice murder, felony murder, aggravated assault, theft by taking, criminal attempt to commit armed robbery, and possession of a firearm during the commission of a felony on September 26, 1997. After a sentencing hearing, the jury sentenced Petitioner to death. The Georgia Supreme Court affirmed Petitioner's convictions but vacated his sentence based on the court's conclusion that one of the jurors should have

been removed for cause based on her pro-death penalty beliefs.  Nance v. State, 526 S.E.2d 560 (Ga. 2000).  After an interlocutory appeal affirming the trial court's ruling that another penalty trial would not violate Petitioner's double jeopardy rights, Nance v. State, 553 S.E.2d 794 (Ga. 2001),[1] the trial court held a second penalty trial which again resulted in a death sentence, and the Georgia Supreme Court affirmed.  Nance v. State, 623 S.E.2d 470 (Ga. 2005).

After the United States Supreme Court denied Petitioner's writ of certiorari, Nance v. Georgia, 549 U.S. 868 (2006), Petitioner filed a petition for writ of habeas corpus in the Butts County Superior Court, which court granted the writ as to Petitioner's sentence based on its conclusion that Petitioner's trial counsel had been ineffective in presenting mitigating evidence during the second penalty trial.  The Georgia Supreme Court reversed and reinstated Petitioner's death sentence.  Humphrey v. Nance, 744 S.E.2d 706, 709 (Ga. 2013).  This action followed.

---

[1] There was also an interlocutory appeal before the first trial, Nance v. State, 471 S.E.2d 216 (Ga. 1996).  As is discussed below, the murder occurred in connection with a bank robbery, and that robbery was tried in federal court.  This first interlocutory appeal (in which the state prevailed) concerned the question of whether the federal court's use of the killings in convicting and sentencing Petitioner in relation to the bank robbery charges prevented the state from trying him for the murders under the Double Jeopardy Clause.

AO 72A
(Rev.8/8
2)

The Georgia Supreme Court provided the following factual summary of Petitioner's crimes:[2]

> The evidence adduced at trial shows that [Petitioner] stole a 1980 Oldsmobile Omega and drove to the Tucker Federal Savings & Loan on December 18, 1993. He entered the bank wearing a ski mask and gloves and carrying a .22 caliber revolver. While ordering the tellers to put money into two pillowcases he had brought with him, he said "no dye money or I'll kill you" and "I'm going to come back and kill you all if the dye thing goes off." Despite [Petitioner]'s threats, the tellers managed to slip two dye packets in with the money. [Petitioner] exited the bank and got into the Oldsmobile where the dye packets activated, emitting red dye and tear gas. [Petitioner] abandoned the Oldsmobile holding the gun in his right hand covered by a plastic trash bag. His ski mask and the dye-stained bags of money were left in the car.
>
> [Petitioner] ran to a liquor store parking lot. Dan McNeal had just made a purchase at the liquor store and was standing in the parking lot. Gabor Balogh had just left the liquor store and was backing his car out of a parking space. Balogh was only halfway out of the parking space when [Petitioner] ran around the front of Balogh's car, yanked open the front driver's-side door, and thrust his right arm into the car. McNeal saw Balogh leaning away from [Petitioner] with his hands on the steering wheel. He heard Balogh screaming and saying "No, no." [Petitioner] shot Balogh in the left elbow and the bullet entered his chest. The medical examiner testified that the bullet moved downward through Balogh's body, passing between the upper and lower lobes of his left lung and lacerating his heart before stopping in his liver.
>
> [Petitioner] then pointed the gun at McNeal and said, "Give me your keys." McNeal ran around the side of the liquor store and [Petitioner] fired another shot. McNeal was not hit. [Petitioner] apparently ran

---

[2] This factual summary is from Petitioner's second appeal when the Georgia Supreme Court vacated his sentence. In the third appeal, the court used a different summary that is shorter but not as clear.

AO 72A
(Rev.8/8
2)

around the other side of the store because the two men encountered each other behind the store.  McNeal turned and ran back around the store to the parking lot.  He went to Balogh's car and saw Balogh slumped over and gasping for breath.  Balogh died before the ambulance arrived.

[Petitioner] ran to a nearby gas station where he held the gun to his head during a one-hour standoff with police.  He told the police, "If anyone rushes me, there's going to be war."  The police convinced him to surrender.  [Petitioner]'s gloves and shirt were stained with the same red dye used in the dye packets.  A firearms expert testified that [Petitioner]'s gun, which contained two spent shells, was probably the same gun used to kill Balogh.  [Petitioner] confessed to the bank robbery, but said that he had only fired once up in the air to scare Balogh because Balogh was trying to run him over with his car.  To show [Petitioner]'s intent and bent of mind, the State presented evidence that [Petitioner] robbed another bank in the same county in September 1993 and issued a similar threat to the teller.  In the penalty phase, the State presented evidence that [Petitioner] committed an armed robbery in Kansas in 1984.

The evidence was sufficient to enable a rational trier of fact to find beyond a reasonable doubt proof of [Petitioner]'s guilt of malice murder, felony murder, aggravated assault, theft by taking, criminal attempt to commit armed robbery, and possession of a firearm during the commission of a felony.

Nance v. State, 526 S.E.2d 560, 563-64 (Ga. 2000) (citation omitted).


## II. **Petitioner's Final Brief**

In the order of April 26, 2016, [Doc. 38], this Court directed that Petitioner, in his final brief, "must raise all claims, issues, and arguments he wishes the Court to consider.  If a matter is not in the final brief, this Court will not consider it." [Id. at 5-6].  In his final brief, Petitioner has not mentioned many of the claims that he raised

4

AO 72A
(Rev.8/8
2)

in his amended petition.  Accordingly, those claims not discussed in the final brief are deemed abandoned.

Also in the April 26, 2016, order, this Court further directed that Petitioner must change the manner in which he numbered his claims so that those claims are more amenable to review and discussion.  Petitioner has chosen, however, not to number his claims in any manner.  As such, in the discussion below, this Court will adopt its own numbering system.

### III. <u>Standard of Review</u>

Pursuant to 28 U.S.C. § 2254, a federal court may issue a writ of habeas corpus in behalf of a person held in custody pursuant to a judgment of a state court if that person is held in violation of his rights under federal law.  28 U.S.C. § 2254(a).  This power is limited, however, because a restriction applies to claims that have been "adjudicated on the merits in State court proceedings." § 2254(d).  Under § 2254(d), a habeas corpus application "shall not be granted with respect to [such a] claim . . . unless the adjudication of the claim":

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

5

AO 72A
(Rev.8/8
2)

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This standard is "difficult to meet," <u>Harrington v. Richter</u>, 562 U.S. 86, 102 (2011), and "highly deferential" demanding "that state-court decisions be given the benefit of the doubt," <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24 (2002) (citation and internal quotation marks omitted), and requiring the petitioner to carry the burden of proof. <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1398 (2011) (citing <u>Visciotti</u>, 537 U.S. at 25. In <u>Pinholster</u>, the Supreme Court further held,

> that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time i.e., the record before the state court.

<u>Id.</u>; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71-72 (2003) (State court decisions are measured against Supreme Court precedent at "the time the state court [rendered] its decision.").

In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), the Supreme Court analyzed how federal courts should apply § 2254(d). To determine whether a particular state court decision is "contrary to" then-established law, this Court considers whether that decision "applies a rule that contradicts [such] law" and how the decision "confronts

6

[the] set of facts" that were before the state court.  <u>Id.</u> at 405, 406 (2000).  If the state court decision "identifies the correct governing legal principle" this Court determines whether the decision "unreasonably applies that principle to the facts of the prisoner's case."  <u>Id.</u>, at 413.  This reasonableness determination is objective, and a federal court may not issue a writ of habeas corpus simply because it concludes in its independent judgment that the state court was incorrect.  <u>Id.</u> at 410.  In other words, it matters not that the state court's application of clearly established federal law was incorrect, so long as that misapplication was objectively reasonable.  <u>Id.</u> ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").  Habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision."  <u>Harrington v. Richter</u>, 562 U.S. 86, 102 (2011) (internal quotation marks omitted); <u>see</u> <u>Landers v. Warden, Atty. Gen. of Ala.</u>, 776 F.3d 1288, 1294 (11th Cir. 2015).  In order to obtain habeas corpus relief in federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  <u>Harrington</u>, 562 U.S. at 103.

This Court's review of Petitioner's claims is further limited under § 2254(e)(1) by a presumption of correctness that applies to the factual findings made by state trial

AO 72A
(Rev.8/8
2)

and appellate courts.  Petitioner may rebut this presumption only by presenting clear and convincing evidence to the contrary.

## IV. <u>Discussion of Petitioner's Claims for Relief</u>

## A. Claim That Trial Counsel Was Ineffective in Presenting Petitioner's Case in Mitigation at the Resentencing Trial

In his Claim One, Petitioner argues that his trial counsel was constitutionally ineffective in presenting mitigation evidence relating to Petitioner's mental impairments and the fact that those impairments would have been exacerbated by his exposure to tear gas contained in the dye packs that exploded in his car.  According to Petitioner, his trial counsel failed to present sufficient expert evidence regarding Petitioner's brain damage and borderline mental retardation.  Without this evidence, Petitioner claims that the jury did not understand the significance of Petitioner's traumatic upbringing, developmental delays, head injuries, and substance abuse.  Petitioner further claims that trial counsel failed to properly frame Petitioner's mental deficits and place them in context in relation to the circumstances of the crime and the fact that Petitioner was exposed to tear gas just before he shot and killed Gabor Balogh.  Petitioner contends that if the jury had better understood Petitioner's mental

deficits and how Petitioner's condition made him react to being exposed to tear gas, they would not have opted for the death penalty.

To be clear, Petitioner does not contend that trial counsel's investigation into Petitioner's mental dysfunction was inadequate.  Rather, he admits that counsel was aware of Petitioner's mental condition, but claims that counsel's strategic decisions in how to present this evidence were flawed.  [Doc. 43 at 57].

### 1. Legal Standard

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  See Smith v. Robbins, 528 U.S. 259, 285 (2000) (applying Strickland standard to claims of ineffective assistance of appellate counsel).  The analysis is two-pronged, and the court may "dispose of the ineffectiveness claim on either of its two grounds."  Atkins v. Singletary, 965 F.2d 952, 959 (11th Cir. 1992); see Strickland, 466 U.S. at 697 ("There is no reason for a court deciding an ineffectiveness claim . . . to address both components of the inquiry if the [petitioner] makes an insufficient showing on one.").

Petitioner must first show that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  Strickland, 466 U.S. at 690.  The court must be "highly deferential," and must "indulge in a strong presumption that counsel's conduct falls within the wide range of

AO 72A
(Rev.8/8
2)

reasonable professional assistance." <u>Id.</u> at 689.  Furthermore, "[s]trategic decisions will amount to ineffective assistance only if so patently unreasonable that no competent attorney would have chosen them." <u>Kelly v. United States</u>, 820 F.2d 1173, 1176 (11th Cir. 1987).

In order to meet the second prong of the test, Petitioner must further demonstrate that counsel's unreasonable acts or omissions prejudiced him. <u>Strickland</u>, 466 U.S. at 694.  That is, Petitioner "must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u>

2. <u>Background and Discussion</u>

To fully understand the analysis of this claim, some background is necessary: As discussed above, Petitioner was tried and convicted in federal court for bank robbery before his state court murder conviction.  In preparation for the sentencing hearing in this Court, his trial counsel and their investigators "conducted an extensive mitigation investigation, including having [Petitioner] evaluated by two experts, psychiatrist Barry Scanlon, M.D., and psychologist Robert Shaffer, Ph.D. [Before his first state trial, Petitioner]'s attorneys at the Federal Defender met with his state court attorneys and provided them with all extensive [sic] records pertaining to the

Defender's investigation of Mr. Nance's mental health and social history." [Doc. 43 at 31].   Trial counsel in Petitioner's state court murder trial received Petitioner's mental health records from the federal court case counsel and also had further mental health evaluations performed.  During the guilt phase of Petitioner's first state trial, the evidence against Petitioner was overwhelming, and Petitioner's trial counsel focused on presenting evidence that Petitioner did not intend to kill the victim, knowing that such evidence would not disprove Petitioner's criminal intent to shoot the victim but hoping that the jury would consider the evidence mitigating during the sentencing phase.

After Petitioner was adjudged guilty, his trial counsel at the first sentencing phase built on the guilt phase strategy by presenting testimony regarding Petitioner's troubled childhood, verbal and physical abuse by his alcoholic adoptive father, Petitioner's drug and alcohol abuse that began at an early age, and his mental impairments.  In addition to Petitioner's family members, trial counsel used expert testimony from psychologist Dr. Robert Shaffer.   Trial counsel also presented testimony to support their argument that, because of his mental impairments, Petitioner was likely to become more confused, agitated, and panicky than normal as a result of the dye pack detonations and tear gas exposure.   The jury nonetheless opted to sentence Petitioner to death.

At the resentencing trial, trial counsel[3] decided to shift their focus somewhat. They still presented evidence regarding Petitioner's mental impairments and troubled upbringing, but they also presented substantial evidence regarding Petitioner's adaptation to the prison environment, including the testimony of Dr. Daniel Grant, a psychologist and expert in prison adaptation, along with several jail officials who testified to Petitioner's good behavior in jail. Trial counsel sought to show the jury that Petitioner would not be a danger to other prisoners and to prison staff if he were given a life sentence. Dr. Shaffer, who testified at the first trial did not testify at the resentencing trial.

Petitioner raised this claim of ineffective assistance in his state habeas corpus petition, and, as noted above, the Butts County Superior Court agreed that trial counsel had been ineffective and vacated Petitioner's sentence. The Butts County court found that

> Although counsel presented numerous lay witnesses to testify regarding Petitioner's difficult family life, substance abuse, and learning disabilities, no witness testified to Petitioner's neurological deficits and borderline mental retardation. Furthermore, the lay witness testimony

---

[3] Petitioner had the same two-lawyer team for the first trial and the resentencing trial. However, the lawyers switched positions for resentencing, and the lawyer that focused on the guilt phase in the first trial, handled the resentencing trial.

12

was presented without explanatory interpretation by a mental health expert.

[Doc. 23-51 at 51-52].

The Georgia Supreme Court, however, reversed and reinstated Petitioner's death sentence.  Humphrey, 744 S.E.2d at 709 (Ga. 2013).   In reversing the state habeas corpus court in an extensive and well-reasoned discussion, the Georgia Supreme Court first identified the proper standard for evaluating a claim of ineffective assistance under Strickland, Humphrey, 744 S.E.2d at 710, before concluding, generally, that trial counsel's decisions regarding what evidence to present were reasonable strategic decisions for which counsel could not be faulted.  The state court further concluded that even if trial counsel had been ineffective, Petitioner suffered no prejudice because the evidence that Petitioner now claims that they should have presented would not have changed the outcome of the resentencing trial.  Having carefully reviewed the Georgia Supreme Court's opinion in light of Petitioner's arguments, this Court concludes that the state court's decision was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," nor did it result "in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  Petitioner is thus not entitled to relief with respect to his first claim of ineffective assistance.

13

a. <u>Petitioner's Arguments that the Georgia Supreme Court Erred in Determining that Trial Counsel was not Ineffective</u>

In contending that the Georgia Supreme Court's ruling that Petitioner's counsel was not ineffective is not entitled to deference under § 2254(d), Petitioner first states that

> [i]n Georgia, the failure to present available evidence of the defendant's psychiatric treatment history or mental health problems, especially when counsel is aware of such information, or to make that a part of what an expert shares with the jury about a defendant's mental health status, falls below prevailing professional norms for capital representation.

[Doc. 43 at 107].

This Court first points out that a blanket constitutional requirement to use all available mental health evidence during the sentencing phase of a death penalty trial does not exist. Instead, the "principal concern . . . is not whether counsel should have presented a mitigation case, [but] whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the Petitioner]'s background was itself reasonable." <u>Wiggins v. Smith</u>, 539 U.S. 510, 522-23 (2003). As with all types of evidence that may be available, trial counsel must evaluate mental health evidence and determine whether it helps the defendant's cause and whether using it is consistent with trial strategy. For example, trial counsel in preparing a mitigation case will

14

typically avoid presenting evidence of a diagnosis that their client has psychopathic tendencies.

Moreover, the three cases that Petitioner cites in support of his contention do not voice such a requirement and are clearly distinguishable.  In <u>Turpin v. Lipham</u>, 510 S.E.2d 32, 40-41 (Ga. 1998) and <u>Martin v. Barrett</u>, 619 S.E.2d 656 (Ga. 2005), trial counsel failed to have the defendant's mental health records evaluated by an expert. In <u>Head v. Thomason</u>, 578 S.E.2d 426, 429-30 (Ga. 2003), trial counsel promised to give a mental health expert the defendant's school, medical, and institutional records as well as information about the crime for a forensic evaluation but never followed through.  Also in <u>Thomason</u>, trial counsel gave up on using expert mental testimony when his request for funding was denied by the trial court after trial counsel did not present the motion properly, despite the facts that the expert was willing to testify for much less and that trial counsel knew that the expert could give favorable mitigation testimony.  Here, there is no question that trial counsel's investigation into Petitioner's mental status met constitutional requirements, and Petitioner merely attempts to fault his trial counsel for failing to present all the evidence they could have.

In further attempting to show that this Court should not defer to the Georgia Supreme Court's conclusion, Petitioner next argues that

> In concluding that trial counsel performed reasonably by omitting the
> critical mitigating evidence that Dr. Shaffer could have provided the jury,

15

the Georgia Supreme Court relies in part on the notion that state expert [Dr.] Theresa Sapp could have been called to rebut it. However, the Court mischaracterizes her testimony as being at odds with Dr. Shaffer's, when in fact they are largely consistent.

. . . . Despite the general agreement regarding [Petitioner]'s brain damage, borderline intellectual functioning, and substance dependency, the Georgia Supreme Court concluded that trial counsel reasonably opted not to present Dr. Shaffer's testimony to avoid possible testimony from Dr. Sapp even though trial counsel never testified to such reasoning. This unreasonable finding unreasonably misrepresents the lower court's fact findings and fails as a reasonable justification for counsel's failure to present readily available and highly mitigating evidence to his 2002 sentencing jury.

[Doc. 43 at 108-09].

This argument is plainly misleading. The discussion in the Georgia Supreme Court's opinion that Petitioner refers to does not discuss why it was reasonable for trial counsel not to call Dr. Shaffer. Rather, the court explains why trial counsel was not ineffective for failing to solicit testimony from Dr. Grant that Petitioner was "borderline mentally retarded" or that he had "borderline mental functioning" because "the psychological diagnosis of 'borderline mental retardation' has been eliminated because it is no longer considered to be 'relevant terminology.'" Humphrey, 744 S.E.2d at 720 (citing, *inter alia*, AMERICAN PSYCHIATRIC ASSN., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 41-45 (Text Rev. 4th ed. 2000)).

The Georgia Supreme Court noted that trial counsel presented substantial evidence regarding Petitioner's low intellectual functioning. However,

16

Dr. Grant still did not use the terms "borderline intellectual functioning" or "borderline mental retardation" to describe [Petitioner]'s level of intelligence as Dr. Shaffer did in the original trial, and trial counsel could have reasonably concluded that, if he did so, the State likely would present their own expert, Dr. Theresa Sapp, to testify in rebuttal, as it did in the original trial, to explain to the jurors that "borderline mental retardation" is not mental retardation and to explain the difference that exists between "borderline intellectual functioning" and mild mental retardation. Specifically, at the sentencing phase of [Petitioner]'s original trial, Dr. Sapp, who had conducted a pretrial evaluation of [Petitioner], testified that [Petitioner]'s score of 77 on the IQ test administered to him by Dr. Shaffer "f[e]ll[ ] within what is known as the borderline range of intellect." Then she explained the following:

> In that range of intellect, a person is generally capable of achieving secondary education. They may have to repeat certain classes, but they're generally able to hold down a job, they're able to live independently.

Dr. Sapp differentiated persons with mild mental retardation by stating that they were usually incapable of achieving beyond the sixth grade level. She testified that [Petitioner] was unclear about what grade he completed in school but that he did tell her that he completed his GED while in prison.

Dr. Sapp also testified that she asked [Petitioner] about his work history, that she determined from his responses that [Petitioner] did what he perceived to be in his best interests, and that she did not get the sense that [Petitioner] was ever forced out of a job or unable to work because of factors other than his own choices. Moreover, had Dr. Sapp been called again by the State as a rebuttal witness, she likely would have testified, as she did at the original trial, that she perceived indications that [Petitioner] was malingering during her evaluation of him. Based on the foregoing, we fail to see how trial counsel were deficient in not ensuring that Dr. Grant or another expert used the term "borderline intellectual functioning" or "borderline mental retardation" when describing [Petitioner]'s impairments.

AO 72A
(Rev.8/8
2)

Humphrey v. Nance, 744 S.E.2d 706, 722 (Ga. 2013).

Accordingly, it is clear that the Georgia Supreme Court did *not* aver that Dr. Sapp would have rebutted Dr. Shaffer's testimony or that trial counsel made a strategic decision not to call Shaffer to the stand because Dr. Sapp would rebut that testimony.

Petitioner's assertion that the Georgia Supreme Court concluded that trial counsel was "reasonable in omitting evidence of [Petitioner]'s borderline intellectual functioning," [Doc. 43 at 109], is again misleading.  The Georgia Supreme Court did *not* make that conclusion.  Instead, the court dedicated substantial discussion to its finding that "that trial counsel did present significant evidence at the resentencing trial regarding [Petitioner]'s low intelligence and how it affected his life."  Humphrey, 744 S.E.2d at 721-22.

Petitioner next faults the Georgia Supreme Court for its conclusion that trial counsel's failure to present evidence of Petitioner's frontal lobe impairment was the result of a strategic decision of trial counsel.  However, as this Court has stated, there is no dispute that trial counsel's investigation in preparation for the resentencing trial was more than adequate, and, because trial counsel presented the frontal lobe evidence at the first trial, it is obvious that trial counsel new about the impairment.  See Strickland, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

18

Accordingly, the law strongly presumes that counsel's decision to forego presentation of that evidence was grounded in reasonable trial strategy, id. at 689; see also Chandler v. United States, 218 F.3d 1305, 1314 (11th Cir. 2000), and, in order to be accorded relief, Petitioner must overcome that strong presumption, which he has failed to do. As a result, Petitioner's argument that the Georgia Supreme Court's finding is not supported by the record in insufficient.

Petitioner also argues that the Georgia Supreme Court erred in concluding that trial counsel acted reasonably in deciding not to present the testimony of Dr. Shaffer in the resentencing trial because trial counsel felt that Dr. Shaffer had been effectively discredited on cross examination. According to Petitioner, trial counsel cited only one instance in which Dr. Shaffer had been discredited, and he claims that further study by Dr. Shaffer would have enabled Dr. Shaffer to more effectively confront the prosecution's efforts to impeach his testimony. At the outset, it is clear that Petitioner minimizes the degree to which the prosecution discredited Dr. Shaffer in the first trial. Dr. Shaffer had based his diagnosis, in part, on events – head injuries, illnesses, and abuse – that either had insufficient testimonial support or were contradicted by other testimony presented at the first trial. More importantly, trial counsel testified at the state habeas corpus hearing that the decision not to put Dr. Shaffer on the stand was entirely strategic. Given the fact that Dr. Shaffer had been discredited the first time he

AO 72A
(Rev.8/8
2)

testified, it cannot be said that no reasonably competent lawyer would agree with trial counsel's decision.  Whether Dr. Shaffer would have testified better at the resentencing trial is an unknown, and it is not as if trial counsel eschewed expert mental health testimony altogether.  Dr. Grant, having performed his own evaluation of Petitioner as well as reviewing Dr. Shaffer's report, testified, and the fact that Dr. Grant's testimony might not have been as productive as Dr. Shaffer's potentially could have been is not the fault of trial counsel and does not render trial counsel's assistance ineffective.  This Court further questions how effective Dr. Shaffer's testimony at the resentencing trial would have been when considering the fact that he would have changed his testimony from the first trial, which is something that the prosecution certainly could have pointed out to the jury.

In response to Petitioner's next argument that the Georgia Supreme Court erred in determining that trial counsel acted reasonably in deciding not to present expert testimony on the effect of tear gas on Petitioner, this Court notes that Petitioner fails to effectively rebut the basis of the state court's reasoning.  The court pointed out that trial counsel was never asked why they did not present the tear gas expert's testimony and noted that "trial counsel also elicited testimony at the resentencing trial similar to that elicited at the original trial to support their theory that [Petitioner] became

AO 72A
(Rev.8/8
2)

panicked as a result of the dye packs' detonation, that he did not intentionally shoot the victim, and that he never intended to harm anyone." Humphrey, 744 S.E.2d at 729.

Petitioner's argument on this point focuses on what an expert could have said at the resentencing trial. However, even if the testimony of the expert that testified for Petitioner at the state habeas corpus hearing might have benefitted Petitioner at the resentencing, Petitioner failed to overcome the presumption that trial counsel's decision not to use such an expert was grounded in reasonable strategy. In response to cross-examination by Respondent, trial counsel testified at the state habeas corpus hearing that, because of the notations that he made in his notes, he must have spoken to the tear gas expert prior to the first trial, even though he did not remember doing so or why he did not call that expert as a witness. [Doc. 17-57 at 43-44]. Trial counsel further testified that he used other witnesses to get his point across to the jury that Petitioner had been exposed to the tear gas and the effect that it would have had on Petitioner. [Id. at 44-46].

While trial counsel might not have recalled the specifics regarding the expert, the record makes clear that trial counsel knew about the expert and what the expert had to say. See Strickland, 466 U.S. at 690–91. As a result, the decision not to call the expert to testify is the "epitome of a strategic decision." Conklin v. Schofield, 366 F.3d 1191, 1204 (11th Cir. 2004).

21

Petitioner's next argument that the Georgia Supreme Court erred fails because he again mischaracterizes the state court's conclusion. Petitioner claims that the state court suggested that Petitioner's mental impairments would not have been mitigating. In fact, what the court said was that

> there was not enough of a difference between the evidence presented during the resentencing trial and the evidence presented in the habeas proceeding regarding [Petitioner]'s low level of intelligence to establish a reasonable probability of a different outcome and that [Petitioner] was not prejudiced by the fact that no expert used [the terms "borderline mental retardation" or "borderline intellectual functioning"] in his resentencing trial to describe his mental impairments.

Humphrey, 744 S.E.2d at 722.

In other words, the state court concluded that trial counsel had elicited sufficient evidence and testimony on Petitioner's mental impairments so that the additional evidence presented at the state habeas corpus hearing would not have made a difference.

Likewise, Petitioner's argument that the Georgia Supreme Court erred by suggesting "that a diagnosis of borderline intellectual functioning would have undermined counsel's strategy regarding prison adaptability," [Doc. 43 at 149], also mischaracterizes what the court said. The court was commenting on the possible strategic reasons that trial counsel might have decided not to present the evidence – rather than expressing its own opinion – and deeming the strategy to be reasonable in

22

AO 72A
(Rev.8/8
2)

light of the other mitigating evidence presented. <u>Humphrey</u>, 744 S.E.2d at 727. While this may seem to be a thin distinction, courts must confer wide latitude in the evaluation of trial counsel strategy without the distorting effects of hindsight. <u>Strickland</u>, 466 U.S. at 669.

      b. <u>Petitioner's Arguments that the Georgia Supreme Court Erred in Determining that He Was Not Prejudiced by Trial Counsel Ineffectiveness</u>

Petitioner also argues that the Georgia Supreme Court's prejudice analysis was contrary to or an unreasonable application of federal law for a variety of reasons.[4] He first claims that the state court improperly considered evidence of Petitioner's organic brain damage and his borderline retardation in isolation, thereby ignoring "the significance of how together they would have reduced [Petitioner]'s moral culpability."

As Respondent points out, however, under the heading "Collective Assumed Prejudice Regarding the 2002 Resentencing Trial," the state court did, indeed, assess the cumulative weight of Petitioner's psychological/brain function evidence (in addition to evidence regarding Petitioner's exposure to tear gas):

> In sum, even if counsel had referred to [Petitioner]'s low average intelligence as "borderline intellectual functioning" and "borderline

---

[4]This Court notes that Petitioner has failed to demonstrate that the state court erred in determining that trial counsel was not ineffective. Accordingly, the prejudice discussion is not really necessary.

AO 72A
(Rev.8/8
2)

mental retardation" and had presented evidence of [Petitioner]'s organic brain damage and the testimony of [the tear gas expert] in mitigation during [Petitioner]'s 2002 resentencing trial, we conclude that there is no reasonable probability that the outcome would have been different.

Humphrey, 744 S.E.2d at 731.[5]

This Court is further unmoved by Petitioner's argument that the evidence that he believes his trial counsel should have presented would have reduced Petitioner's moral culpability in the mind of the jurors "for a crime that was already clearly un-premeditated." [Doc. 43 at 152]. As noted by the Georgia Supreme Court,

> the officer who negotiated [Petitioner] into surrendering to police testified . . . that [Petitioner] told him: "I tried to get a car and the man started yelling at me and I shot at him a couple of times, and do you know if he's hurt or if anybody's hurt." [According to Petitioner]'s own statement and McNeal's eyewitness testimony . . . [Petitioner] yanked open the door of Balogh's moving car, . . . he argued with Balogh, . . . Balogh raised his arm defensively and shouted "no, no, no," and . . . [Petitioner] turned to McNeal immediately after he shot Balogh and demanded McNeal's keys . . . .

Humphrey, 744 S.E.2d at 731-32.

While Petitioner might not have intended to hurt anyone when he entered the bank that day, the jury heard plenty of testimony to support the theory that, when he

---

[5] This Court further notes that this case is not analogous to Ferrell v. Hall, 640 F.3d 1199, 1234 (11th Cir. 2011), which Petitioner cites in support of his argument. In Ferrell, the Eleventh Circuit found that trial counsel's "unreasonably constricted mitigation investigation fail[ed] to uncover relevant mental health evidence in Ferrell's favor." Id. at 1230. In this case, Petitioner concedes that trial counsel's investigation was adequate.

AO 72A
(Rev.8/8
2)

was bent on avoiding apprehension after he left the bank, Petitioner was acting in a controlled and calculating manner, and this Court is not at all convinced that the introduction of evidence of Petitioner's mental deficiencies and the effect of the tear gas on Petitioner would have changed the outcome of the resentencing trial. Accordingly, this Court cannot conclude that the Georgia Supreme Court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," Harrington v. Richter, 562 U.S. 86, 103 (2011).

With respect to the remainder of Petitioner's arguments that the Georgia Supreme Court's prejudice analysis is not entitled to § 2254(d) deference, this Court notes that none of the evidence that Petitioner presented in the state habeas corpus trial was so compelling as to undermine this Court's confidence in the outcome of the resentencing trial. Trial counsel made a good case in mitigation considering what they had to work with , and whether the jury would have been decisively swayed by different evidence is impossible to say. Accordingly, this Court has no basis to find fault with the state court's conclusions.

Moreover, this Court returns to the discussion above, and points out that, based on the depth of trial counsel's investigation and level of preparation for the resentencing trial as well as the clear choices that trial counsel made, it is clear that

AO 72A
(Rev.8/8
2)

trial counsel was not ineffective under <u>Strickland</u> in the first instance.  As such, the discussion regarding prejudice is entirely moot.

**B. Claims That Trial Counsel Was Ineffective in Failing to Object to, Rebut, and Mitigate State Evidence in Aggravation that Undermined Petitioner's Theory of Remorse.**

   1. <u>Claim that Trial Counsel Failed to Object to Video</u>

   During the resentencing trial, the state played a video taken from media coverage of Petitioner's standoff with police after the bank robbery and murder.  In his Claim Two,  Petitioner complains that trial counsel failed to object to the fact that prosecutors had heavily edited the video prior to playing it for the jury and that the portions of the video that prosecutors removed contained mitigating statements that would have shown Petitioner's remorse.

   Respondent has demonstrated that this claim is unexhausted and thus procedurally defaulted, <u>see</u> <u>Bailey v. Nagle</u>, 172 F.3d 1299, 1303 (11th Cir. 1999) (noting that a claim is procedurally defaulted when petitioner never raised the claim in state court and it is clear the claim would be procedurally barred in state court), and Petitioner obviously concedes the default because he failed to argue otherwise. Moreover, Petitioner's contention is not properly developed to state a claim.  Petitioner

AO 72A
(Rev.8/8
2)

argues that trial counsel failed to object to demonstrating the edited video to the jury, but he entirely fails to show that the objection would be valid. Indeed, the comments that Petitioner now claims should have been left on the news footage video for the jury to hear were all either commentary by a reporter or were statements made by a police spokesman, and it would appear that those statements were properly removed before the video was aired for the jury. Petitioner further failed to solicit any testimony from trial counsel as to why they failed to object to the redacted version of the video. See Williams v. Allen, 598 F.3d 778, 794 (11th Cir. 2010) ("An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of counsel's competency. Therefore, where the record is incomplete or unclear about counsel's actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.").

2. Claim that Trial Counsel Erred by Failing to Argue Mitigating Nature of Petitioner's Federal Conviction

As mentioned above, before he was prosecuted in state court, he pled guilty and was convicted and sentenced in this Court for two counts of bank robbery. He received a life sentence. During Petitioner's resentencing trial, prosecutors introduced the federal convictions and argued that, because Petitioner was already subject to a life

AO 72A
(Rev.8/8
2)

sentence, anything short of a death sentence would give Petitioner "a free ride for murder." [Doc. 16-10 at 34-35].   In Claim Three, Petitioner argues that his trial counsel erred in failing to point out the mitigating qualities of the federal convictions in that they demonstrated Petitioner's acceptance of responsibility.

As with Petitioner's previous claim, (1) Respondent has demonstrated that this claim is unexhausted and therefore procedurally defaulted, and Petitioner has failed to argue otherwise, and (2) Petitioner has failed to perfect the claim because he failed to ask trial counsel why he failed to bring the argument.  This Court also points out, as noted by Respondent, that trial counsel did present substantial evidence of Petitioner's remorse for the murder, and this Court is not convinced that the argument  that Petitioner claims trial counsel should have made was at all compelling or would have swayed the jury.

## C. Claim That the State Court Improperly Applied Proportionality Review

In Claim Four, Petitioner asserts that his rights were violated when the Georgia Supreme Court failed to properly conduct the proportionality review required by state law.   In affirming Petitioner's sentence after his resentencing trial, the Georgia Supreme Court held that Petitioner's "death sentence is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes

AO 72A
(Rev.8/8
2)

and the defendant." <u>Nance v. State</u>, 623 S.E.2d at 476 (listing cases that were comparable to Petitioner's). The court cited to O.C.G.A. § 17–10–35(c)(3) which requires the court to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

In approving Georgia's death penalty scheme, the United States Supreme Court cited favorably to the proportionality review requirement as a "provision to assure that the death penalty will not be imposed on a capriciously selected group of convicted defendants," <u>Gregg v. Georgia</u>, 428 U.S. 153, 204 (1976), and noted that "[i]t is apparent that the Supreme Court of Georgia has taken its [proportionality] review responsibilities seriously," <u>id.</u> at 205. The Court also noted that

> The provision for appellate review in the Georgia capital-sentencing system serves as a check against the random or arbitrary imposition of the death penalty. In particular, the proportionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury. If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death.

<u>Id.</u> at 206.

It may well be, as Petitioner claims, that in recent years the Georgia Supreme Court's proportionality reviews has become little more than a rubber stamp and that Petitioner's extensive discussion of other armed robbery cases in Georgia demonstrates

29

that the state court might have determined that the sentence imposed in his case was disproportionate. This Court stresses, however, that the United States Supreme Court has concluded that proportionality review is not required by the Constitution "where the statutory procedures adequately channel the sentencer's discretion," McCleskey, 481 U.S. at 306 (citing Pulley v. Harris, 465 U.S. 37, 50-51 (1984)), and Georgia's statutory procedures are adequate. Collins v. Francis, 728 F.2d 1322, 1343 (11th Cir. 1984) ("[I]t appears clear that the Georgia [death penalty] system contains adequate checks on arbitrariness to pass muster without proportionality review.") (internal quotations and citations omitted); see also Walker v. Georgia, 129 S.Ct. 481, 482-83 (2008) (Thomas, J., concurring in the denial of cert.) ("Proportionality review is not constitutionally required in any form. Georgia simply has elected, as a matter of state law, to provide an additional protection for capital defendants.") (citing Pulley, 465 U.S., at 45). As the proportionality review is not required by the Constitution, Petitioner cannot claim relief under § 2254 for the Georgia Supreme Court's purported failure to properly carry out its statutory mandate. Lindsey v. Smith, 820 F.2d 1137, 1154 (11th Cir. 1987) ("[W]e refuse to mandate as a matter of federal constitutional law that where, as here, state law requires [proportionality] review, courts must make an explicit, detailed account of their comparisons."). Put more simply, Petitioner's proportionality claim fails to state a claim for federal habeas corpus relief.

As to Petitioner's implicit argument that this Court should disagree with the Georgia Supreme Court, this Court concludes that Petitioner has failed to overcome the hurdle imposed by § 2254(d). Given the fact that proportionality review is not mandated by the Constitution, there simply is no basis for this Court to conclude that the state court's holding "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." While Petitioner may argue that the state court's factual determination was unreasonable "in light of the evidence presented in the State court proceeding," this Court cannot perform its own proportionality determination because under McCleskey (cited above) where the state statutory procedures adequately channel the sentencer's discretion, comity and federalism prevent review of a state law decision.

**D. Claim Regarding Trial Court's Denial of Petitioner's Motion to Preclude the use of a Stun Belt and Petitioner's Assertion that he is Entitled to a Hearing**

At Petitioner's first trial, the trial court held a hearing on Petitioner's motion to preclude the state from requiring Petitioner to wear a stun belt during the trial. State witnesses testified that they considered Petitioner to be a significant flight risk and that Petitioner had threatened to bite a prosecutor. The state presented further evidence regarding the operation of the stun belt – including the fact that activation of the stun

belt can result in self urination and defecation.  Petitioner testified that the stun belt "made him anxious and distracted, interfering with his ability to pay attention to the proceedings, consult meaningfully with his attorneys, and concentrate or think clearly."  [Doc. 43 at 223 (citing Doc. 11-17 at 65-66)].  After the hearing, the trial court denied Petitioner's motion and required him to wear the belt.

Petitioner filed the same motion before the resentencing trial, and when Petitioner brought up the issue again during a motions hearing, the trial court noted that he remembered the evidence from the prior hearing and denied the motion without affording Petitioner a second evidentiary hearing.  In Claim Five, Petitioner now claims that the trial court violated his rights in failing to hold another hearing prior to the resentencing trial before ruling on his motion.

Petitioner raised this claim in his direct appeal.  The Georgia Supreme Court discussed the claim as follows:

> [Petitioner] claims the trial court erred by refusing his request to conduct a hearing on whether he should be required to wear a stun belt during his 2002 sentencing trial. A stun belt is an electronic security device worn by a prisoner that can be activated by a remote transmitter which enables law enforcement personnel to administer an incapacitating electric shock if the prisoner becomes disruptive.  Unlike shackles, it is worn under the prisoner's clothes and is not visible to the jury.  [Petitioner] had worn a stun belt at his 1997 trial.  Before the 1997 trial, the trial judge, who also presided at the 2002 sentencing trial, agreed to the State's request that [Petitioner] wear a stun belt in court after conducting a pretrial hearing where evidence was received that [Petitioner] had threatened to "bite the nose off" the prosecuting attorney during the trial.  At that hearing,

32

witnesses testified about the mechanics of the stun belt, its advantages, and possible alternatives, and [Petitioner] testified about the alleged impact a stun belt would have on his comfort and ability to concentrate. The trial judge stated in 2002 he remembered the evidence from the 1997 stun belt hearing and said he could not disregard [Petitioner]'s threat, even after the passage of several years.  He denied [Petitioner]'s request to conduct another hearing and allowed the use of a stun belt as a security measure at [Petitioner]'s sentencing trial.

It is "well established that the use of extraordinary security measures to prevent dangerous or disruptive behavior which threatens the conduct of a fair and safe trial is within the discretion of the trial court."  Young v. State, 499 S.E.2d 60 (1998).  The trial court conducted a hearing in this case to determine the necessity of a stun belt and concluded the use of a stun belt was warranted by the threat and would not interfere with the ability of the defendant to receive a fair trial.  See id.  The trial court did not err by failing to hold a second hearing in 2002; the only change in circumstance since the 1997 hearing offered by [Petitioner] was the passage of time and this was obvious to the trial court without the need

AO 72A
(Rev.8/8
2)

for a second hearing.  We find no abuse of discretion by the trial court in its ruling on this issue.

Nance, 623 S.E.2d at 474.

Petitioner contends that the Georgia Supreme Court's decision is not entitled to deference under § 2254(d) because the court's decision was contrary to and involved an unreasonable application of clearly established federal law and was grounded in factual findings that were unreasonable in light of the evidence.  This Court disagrees.

The factual findings relied on by the state court were that Petitioner was an escape risk based upon his criminal history and his federal sentence and that Petitioner had made threats against the prosecutor.  Petitioner argues that, because six years had passed since the trial court's initial ruling, the finding that Petitioner was an escape risk should have been reevaluated by the court.  During that six-year period, Petitioner claims that he demonstrated that he was not an escape risk by being a model prisoner.

The problem with Petitioner's argument is that the trial court could have reasonably determined that no matter how well-behaved Petitioner had been in the intervening years – in other words, no matter what evidence Petitioner presented at a new hearing – the evidence produced by the state at the 1996 hearing nonetheless weighed in favor of requiring the restraint.  See Landers v. Warden, 776 F.3d 1288, 1297 (11th Cir. 2015) ("[A]n evidentiary hearing in state court cannot be a requirement for § 2254(d)(2) deference for all disputed factual issues in a state court proceeding.").

34

 Moreover, based on the trial court's discussion of the matter at the 2002 motions hearing, [see Doc. 15-7 at 13-14], it is clear that the judge believed that Petitioner had made a threat against a prosecutor.  While Petitioner may argue that he did not make such a threat, the evidence presented at the 1997 hearing was certainly sufficient for the court to make the finding that Petitioner had, indeed, made the threat, and this Court may not disturb that finding.  See Jones v. Walker, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (an unreasonable determination of the facts occurs when there is nothing in the record to support the state court's finding).  In light of that threat, it was reasonable for the court to deny Petitioner's motion, and this Court is thus precluded from reaching a different outcome under § 2254(d).

Turning to Petitioner's request to present evidence regarding this claim, because this claim was adjudicated in state court, it must be analyzed under § 2254(d).  As this Court noted above, review of claims analyzed under § 2254(d) "is limited to the record that was before the state court that adjudicated the claim," Pinholster, 563 U.S. at 181, and this Court may not use evidence that the state courts did not have access to in rendering a decision.  A hearing is thus not permitted.  French v. Warden, 790 F.3d 1259, 1266 (11th Cir. 2015).

**E.  Petitioner's Request for Discovery and/or a Hearing with Respect to his Proportionality and Ineffective Assistance of Counsel Claims**

35

AO 72A
(Rev.8/8
2)

Finally, Petitioner seeks to conduct discovery and present evidence regarding his claims that his death sentence is disproportionate and that his trial counsel was ineffective in presenting mental health evidence during the resentencing trial. This Court has already determined, however, that petitioner is not entitled to relief on these claims, and Petitioner has failed to present argument that convinces this Court that the evidence that petitioner is reasonably likely to present would have any effect on the outcome of his case.

As to Petitioner's proportionality claim, as discussed above, that claim fails to raise a cognizable § 2254 claim. In the case of the ineffective assistance claim, Petitioner seeks to have a positron emission tomography (PET) scan of Petitioner's brain to "thoroughly investigate Mr. Nance's mental/emotional health in order to competently evaluate and present his constitutional claims in post-conviction proceedings." [Doc. 43 at 237]. This Court is at a loss, however, to imagine what a PET scan might show that could possibly change the outcome of this action. Petitioner has made no assertion that trial counsel was ineffective for failing to secure a PET scan prior to the resentencing trial, and there is no indication in the record that one of Petitioner's mental health experts hired before the trial had recommended a PET scan. As such, trial counsel cannot be faulted for the failure to obtain a PET scan.

AO 72A
(Rev.8/8
2)

Additionally, Petitioner has not suggested that his mental/psychological state is such that he is ineligible to be executed.[6]

> Petitioner states that
>
> [t]his testing may not only reveal evidence that will substantiate the portion of Mr. Nance's ineffective assistance of counsel claim relating to his brain damage and its substantial impact on his choices and behavior at the time of the crime but also may open new avenues of investigation.

[Id. at 239].

This Court's determination that trial counsel was not ineffective, however, was based upon the efficacy of trial counsel's investigation, what trial counsel knew at the time of the resentencing trial, and what strategic choices trial counsel made in light of that knowledge. Regardless of what the testing might show, it cannot affect any of those three determinations.

Petitioner further states that he "does not seek to acquire neuroimaging in order to establish that the [Georgia Supreme C]ourt's determinations are unreasonable," [id.], with respect to that court's conclusion that trial counsel was ineffective. Because establishing the unreasonableness of the state court's determination is the sole avenue of relief under § 2254 for a claim that has been decided on the merits in state court, it

---

[6] Even if a PET scan did show that petitioner is now not subject to execution such a claim would properly be raised in a 42 U.S.C. § 1983 civil rights action.

AO 72A
(Rev.8/8
2)

is further clear that permitting Petitioner to undergo a PET scan could not possibly change the outcome of this action.

For these reasons, this Court concludes that petitioner has not demonstrated that he is entitled to a hearing or to conduct discovery.


## V. **Conclusion**

As discussed, this Court concludes that petitioner has failed to establish that he is entitled to relief under § 2254.  Accordingly, his petition for a writ of habeas corpus is **DENIED**.  The Clerk is **DIRECTED** to **ENTER JUDGMENT** in favor of Respondent and to **CLOSE** this action.

**IT IS SO ORDERED,** this 7th day of August, 2017.


WILLIS B. HUNT, JR.
Judge, U. S. District Court

AO 72A
(Rev.8/8
2)